THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDWARD TURNER, Defendant-Appellant.

First District (4th Division)   No. 78-330

Opinion filed October 18, 1979.

Ralph Ruebner and Fe Fernandez, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James Veldman, and Bruce Brandwein, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Edward Turner, the defendant, was tried before a jury for the murder and armed robbery of Levi Anderson. He was convicted of both crimes and was sentenced to 50 to 100 years for murder and 20 to 40 years for armed robbery, sentences to run concurrently. On appeal defendant contends (1) his guilt was not established beyond a reasonable doubt; (2) he was deprived of a fair trial when the State was permitted to introduce evidence that he had committed a subsequent kidnapping; (3) he was deprived of a fair trial when the State was permitted to introduce evidence of prior burglaries committed by him; (4) the trial court erred in permitting the State to elicit testimony that the police had obtained the approval of the State's Attorney's office before placing felony charges against him; (5) his sentences were excessive; and (6) a new sentencing hearing is required because the trial court considered other alleged crimes of the defendant which had not resulted in convictions.

We reverse and remand for a new trial.

Prior to trial defense counsel made an oral motion in limine to exclude evidence of prior burglaries of Levi Anderson's home allegedly committed by the defendant as well as evidence that defendant attempted to use Anderson's bank book, taken in one such burglary, to withdraw money from Anderson's savings account. In argument on the motion the State represented to the court that a State witness, Walter Goodrum, would testify that on several of these earlier burglaries Anderson was present and defendant would cover him so as to prevent his identification, but that on the last occasion the covering was removed, permitting Anderson to identify defendant and precipitating the murder. Apparently, on the basis of these representations the trial court denied the motion as to prior burglaries but allowed it as to the bank book.

In opening argument to the jury the prosecutor stated that Goodrum would testify that on two occasions prior to the death he and the defendant entered the victim's apartment and took some items. The prosecutor also detailed at some length what the testimony would be concerning a kidnapping scheme carried out by the defendant several weeks after the death of Anderson.

At trial Chicago Police Officer Arthur Munin testified that on October 14, 1975, he spoke to the defendant at 1017 West 59th Street in Chicago. Defendant told him he was worried about his elderly landlord, whom he had not seen for two days. Munin first told defendant to wait several more days but defendant persisted in expressing his concern, so Munin tried the back door, which he found to be locked. Munin again began to leave but

defendant then told him that the back porch light was on although his landlord always turned it off every morning. At Munin's direction the defendant pried the wire mesh off a window, entered the apartment, and opened the door for the officer. Munin heard a radio playing and followed the sound to a bedroom where he found Levi Anderson dead on a bed. He saw no evidence of foul play.

It was stipulated that if called Dr. Choi, a pathologist employed by Cook County, would testify that he examined Anderson's body on October 14, 1975. He had been informed the body was found in bed, with no foul play indicated. He saw no outward signs of trauma in an external examination and performed no autopsy. It was his opinion that the death was due to cardiac arrest.

Walter Goodrum, 17 years old and a corporal in the army at the time of trial, testified that he met the defendant in the summer of 1974. At that time Goodrum lived at 1019 West 59th Street in Chicago with his mother; the defendant lived next door. Goodrum visited the defendant often and considered him a friend, like a big brother. He also knew Levi Anderson, who was defendant's landlord, and for whom he used to do yard work. About a month before Anderson's death, Goodrum and the defendant entered Anderson's apartment using a key defendant had. Anderson was not home at the time and at defendant's direction Goodrum looked for money. Finding none, they took some cans of milk and a can of roach spray. About one week later they again entered the apartment using the key and took some tools.

On October 13, 1975 Goodrum went to visit defendant in his apartment, which was above Anderson's. As he entered the downstairs hallway defendant opened Anderson's door from the inside. Goodrum entered the apartment and saw Anderson lying bound and gagged on the floor, with something covering his eyes. Defendant choked Anderson and asked him where the money was but Anderson said he did not have any. He then kicked Anderson hard and again asked him where the money was. Finally, after being threatened by defendant with a revolver, Anderson directed him to some money in a book; defendant located the money and placed it in his pocket. He then placed Anderson on a chair in the closet and tied him to it. Defendant and Goodrum went up to defendant's apartment but after about three minutes defendant went back downstairs, saying he had left something there. After waiting about five minutes Goodrum went downstairs to tell defendant he was leaving. The door was open and upon entering he saw defendant in the closet with Anderson, who had one hand free and whose eyes were partially uncovered. Defendant said Anderson had gotten loose and had seen him so he would have to kill him. Goodrum responded that he wanted no part of it. Defendant then took a "billy club" and began to press it against

Anderson's neck. Anderson reminded the defendant that he had been good to him, allowing him to live there without paying rent for 10 months. He then told defendant to go ahead and kill him, as he knew he was going to heaven and also knew where defendant was going. Defendant again began forcing the club against his neck. Sickened by what he saw, Goodrum went out into the hallway. He saw two friends coming up the stairs to pick him up for a rehearsal. Before they reached the top of the stairs he told them he would not be going and they left. He then re-entered the apartment and saw that Anderson was dead.

Defendant told Goodrum he would go to jail if he said anything because he was part of it. He then told him to help him put Anderson on the bed and Goodrum complied. Defendant removed the blood from around Anderson's mouth, turned a radio on, and also turned on the light. They then left the apartment, defendant locking the door behind them. Defendant reminded Goodrum that he would go to jail if he said anything. The next day Goodrum saw the defendant, who told him the police had discovered the body and believed the death to have been a natural one.

At this point in the testimony of Walter Goodrum, the State elicited from him, without objection by defense counsel, a lengthy and detailed account of a kidnapping scheme devised by defendant. Goodrum testified that on November 4, 1975, he stopped at defendant's apartment on the way to school to retrieve a book. Defendant said he wanted to feign a kidnapping because he needed money. Goodrum was to be the pretended victim. Goodrum told him he was crazy but defendant locked the door and said if he did not comply he would harm Goodrum or Goodrum's sisters in the same manner he had harmed Anderson. Goodrum had two sisters, ages 15 and 17, living at home at the time. Goodrum remained in the apartment for two days. At about 7 the second morning someone rang the doorbell. Goodrum complied with defendant's order to go into a closet and defendant answered the door. He then returned from the door and told Goodrum he was going next door to Goodrum's mother's house, so Goodrum should not forget what he had said about his sisters. He was gone about two hours. When he returned he got some newspapers and began cutting out letters and pasting them on a brown paper bag. He then cut Goodrum's thumb with a razor blade and smeared the blood over an envelope. Goodrum read some of the note and recalled it said something about $2,000. Defendant then placed the note in Goodrum's mother's mailbox. That evening between 7:30 and 8 p.m. someone rang the doorbell. Goodrum got in the closet at defendant's direction. About five minutes later he was discovered there by Officer Dowd. The officer asked who he was and he first gave a false name because he was afraid of the defendant. The

officer then took Goodrum into a front bedroom where Goodrum said he immediately told about Mr. Anderson. At trial Goodrum identified a number of items and photographs of items belonging to Anderson which were recovered from defendant's apartment, including a C.T.A. reduced fare card, Anderson's will, a certificate of deposit, and the tools and roach spray taken from Anderson's apartment. He also identified photographs of items and some of the actual items used in the kidnapping scheme, including the newspaper from which the note was cut, a picture of his thumb showing the razor cut, peroxide and swabs he used to care for the cut at defendant's apartment, and the ransom note. Finally he identified the "billy club" used by the defendant.

On cross-examination Goodrum testified that when he came to defendant's building on the day of Anderson's death he did not knock on Anderson's door or ring his doorbell before defendant opened Anderson's door. He testified that after he was discovered in defendant's closet he gave two statements to the police. He could not recall whether in his first statement to the police he told them of the two friends he had seen during the murder, but he believed he told them of this in the second statement, which was tape-recorded. He did not recall telling the police that defendant took Anderson into the bedroom and then choked him. He did concede that in the tape-recorded statement he told the police that defendant placed the body on the bed and he stood and watched the entire incident. During the kidnapping the defendant left the apartment once or twice without locking it, but Goodrum did not flee because he was afraid for his sisters.

The next witness for the State was Investigator Thomas Dowd. On November 5, 1975, he interviewed Goodrum's mother, Mrs. Patsy Brown, and examined two kidnapping notes received by her. One note was smeared with blood, determined by the police to be of human origin, and demanded $2,000 for Goodrum's return. Defense counsel objected to this entire line of questioning concerning the kidnapping as irrelevant to the charge of murder but the objection was overruled. Dowd further testified that the evening of November 5 he went to defendant's house and defendant consented to a search of the apartment. Dowd found Goodrum, who appeared completely shaken physically, in a closet in the rear bedroom. Goodrum first identified himself as Leroy but also said if he could be protected he would tell everything. Dowd assured him of protection and took him to a front bedroom where he took a statement.

Dowd testified that a number of items were found in defendant's apartment at that time, including a police baton, several pages of the Chicago Sun-Times with the words and letters cut out, a C.T.A. reduced fare card issued to Levi Anderson, Anderson's will, and his certificate of deposit. He identified these items from photographs after being shown

the actual items. He also identified photographs showing Goodrum's cut thumb and the peroxide and swabs Goodrum said he used on the thumb. Over defense objection Dowd then testified that they contacted the State's Attorney's office because they believed Anderson had been murdered and they wished to place a charge against the defendant. They also obtained a court order to exhume Anderson's body and subsequently an autopsy was performed.

On cross-examination Dowd stated that when the statement was taken from Goodrum they "called over" his stepfather from next door and then took a tape-recorded statement. In that recorded statement Goodrum told the police defendant took Anderson into the bedroom and choked him. Dowd further testified that when defendant allowed them in to search the apartment the newspapers and police baton they found were in plain view.

When the next witness, Patsy Brown, was called to testify the defense objected on the ground that her testimony would only relate to the kidnapping and would be irrelevant and immaterial to the murder charge. The State responded that the kidnapping testimony was necessary to show how the murder was discovered. The court overruled the defense objection and Patsy Brown testified. On November 4, 1975, she found an envelope in her mailbox containing some of Goodrum's papers and a ransom note. She called the police and was advised to come to the station with her husband. At 4 the next morning, when her son still had not come home, she called her husband at work. When her husband got home that morning he went next door to the defendant's home to ask if he had heard anything from Walter Goodrum. Defendant then came over to their house, telling them when they asked that he had not seen Goodrum the day before. They were afraid to leave their two daughters alone, so defendant offered to stay with them while they went to the police station. When they got back she found a second ransom note in the mailbox. Defendant was still there; they told him the police were investigating and he went home.

It was stipulated that if Dr. Robert Stein were called he would testify that as a Cook County pathologist on November 23, 1975, he performed an autopsy on the body of Levi Anderson. After an examination specifically directed to the upper chest and neck, it was his opinion that the cause of Anderson's death was a traumatic fracture of the thyroid and hyoid bones. It was also stipulated that defendant was 25 years old at the time of trial.

Defense counsel moved to strike the testimony of Patsy Brown as irrelevant and immaterial to the murder charge. The State responded that her testimony tended to corroborate some of Goodrum's testimony

concerning the kidnapping scheme. The court denied the motion to strike, but offered to give a limiting instruction stating that only the charges in the indictment were at issue. Over defense objection to all evidence of kidnapping, the court admitted into evidence the ransom notes, the newspapers used to make the notes, photographs of those items and a photograph of Goodrum's thumb. The State argued generally that these items served to corroborate Goodrum's testimony and to explain why he did not immediately report the murder to the police. Also admitted over defense objections were Anderson's C.T.A. card and photographs of his will and his certificate of deposit. The State argued that these items corroborated Goodrim's testimony that they had been in Anderson's apartment before and had taken items from it. The police baton was admitted without objection as was a photograph which portrayed the can of spray taken from Anderson's apartment and the peroxide and swabs used by Goodrum to treat his thumb. All these items went to the jury with the exception of the C.T.A. card, the latter being kept from them because it had a picture of Anderson on it. In argument on whether the kidnapping items should go to the jury the prosecutor argued that they served to buttress Goodrum's testimony and enhanced his credibility.

The State offered, but defense counsel refused, an instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (1968)) that evidence of other crimes was to be considered solely on the issue of the defendant's intent, motive, and design.

In final arguments to the jury the prosecutor referred to the fact that Goodrum and the defendant had previously taken items from Anderson's apartment. He also argued that the items found in defendant's apartment which belonged to Anderson supported an inference that defendant had been "ripping off" Anderson constantly. The prosecutor stated the evidence of the kidnapping was crucial because it showed how the murder was discovered. He also referred to the "tremendous" amount of evidence concerning the kidnapping, saying that it could be explained as showing defendant's arrogance and confidence that he had already gotten away with murder. The prosecution also argued that this evidence of the kidnapping served to corroborate Goodrum's testimony. They also informed the jury that Goodrum's testimony was supported by every piece of physical evidence they would see, including Goodrum's cut thumb and the bloody ransom note.

After judgment was entered on the jury's verdicts, the defense made an oral motion for a new trial based in part on the contention that defendant was denied a fair trial by all the evidence about the alleged kidnapping scheme. In response the prosecution argued that this evidence

was used to "prove and substantiate" the testimony of Walter Goodrum. The defense motions for a new trial and in arrest of judgment were denied.

At the sentencing hearing the State argued in aggravation, without objection from the defense, that the kidnapping was part of a coercive effort by the defendant to cover up his crime. They also referred to the evidence that defendant and Goodrum had previously broken into Anderson's apartment and stolen items. The court did not specifically refer to those other crimes in sentencing defendant; it did state it had considered all matters in aggravation as well as those in mitigation.

## I.

Defendant's contention that his guilt was not established beyond a reasonable doubt essentially represents an attack on the credibility of Walter Goodrum. The jury, as fact-finder, clearly believed his testimony and ordinarily a reviewing court will not substitute its judgment in such a matter. (*People v. Nelson* (1974), 58 Ill. 2d 61, 317 N.E.2d 31; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) But defendant asserts that Goodrum's testimony must be viewed with suspicion because he had a motive to fabricate and because it contained improbable elements.

■■ It is true that the testimony of a witness who has a motive to fabricate must be eyed with suspicion. (*People v. Williams* (1976), 65 Ill. 2d 258, 357 N.E.2d 525.) Two examples of such motives are found in *Williams*, cited by defendant. There one key State witness agreed to testify only after he was informed by the police that he would be charged with the murder at issue. A second important State witness had been promised immediate release from prison in return for his agreement to testify. In this cause there was no evidence of such an agreement, nor was there any showing that Goodrum had been threatened with prosecution for the murder. Indeed at the time that he told the police of the murder he was aware that no such murder was even suspected. Thus the fact that he was seen in Johnson's building the day of the murder or the fact of his having witnessed that death would not supply a motive to fabricate absent the focussing of some suspicion on him by the authorities concerning that death. Contrary to the defendant's assertion on appeal, at trial Goodrum did not testify that he failed to initially tell the police he had been seen by two friends in Johnson's building; he testified that he could not remember whether he told the police this. Nor did the defense ever introduce a prior statement by him establishing this omission. The only inconsistencies established at trial were that in one statement to the police Goodrum said that only defendant carried Anderson to the bed and he also told them that Anderson was choked in the bedroom rather than the closet. But again contrary to what defendant claims, Goodrum did not deny these

inconsistencies. He admitted that in a prior statement he did not mention his help in carrying Anderson, and he said only that he did not remember telling the police that Anderson was choked in the bedroom. We do not find that these factors support defendant's claim that Goodrum first denied any involvement in the death and then admitted limited involvement under threat of perjury.

But even assuming that a motive to fabricate is demonstrated, this only casts suspicion on testimony and requires closer scrutiny, it does not require that it be rejected. Thus in *Williams* the court scrutinized the testimony of the two State witnesses with motives to fabricate and found such material inconsistencies in their testimony as to require reversal of the conviction founded on that testimony. Contrary to defendant's contention, upon scrutiny of Goodrum's testimony in this cause we do not find such inconsistencies or improbabilities as would cause a reasonable doubt of defendant's guilt nor do the points raised by defendant create such doubt. Thus the fact that according to Goodrum defendant opened the door to Anderson's apartment without Goodrum having rung Anderson's bell or knocked on Anderson's door may have been due to defendant having seen Goodrum approaching through a window. Defendant asserts that when Goodrum returned to Anderson's apartment to tell defendant he was leaving he found the door wide open at a time when the attack on Anderson was commencing. But in fact Goodrum testified only that the door was open, which could have meant unlocked. Furthermore his testimony also established that defendant had returned to find his victim partially loose; the need to restrain him may have accounted for the door being ajar, if it *was*. Although defendant states that no bruises were found on Anderson despite Goodrum's testimony that he was kicked hard by the defendant, no testimony was directed to the presence or absence of such bruises. The stipulated testimony of Dr. Choi that no *trauma* was found did not necessarily exclude bruises. Defendant also questions Goodrum's testimony that Anderson was killed because his blindfold had slipped and he could identify defendant, noting that as defendant's landlord he would have already recognized defendant's voice. Of course a visual identification is much stronger than one based on voice recognition; but even assuming some flaw in logic this could be attributed to the thought process of the killer rather than that of Goodrum. Defendant also questions Goodrum's inability to recall whether defendant's apartment had a phone when there was evidence that a phone call was made from the apartment to his father when he was found. But in fact the testimony of Officer Dowd was merely that the stepfather was "called over" from next door. If this referred to a phone call, it may have been made from Anderson's apartment. The fact that Goodrum did not report what was happening to his friends when he saw

them, or to the police for 1½ months, does not reflect well on his civic responsibility, but is explained by the additional fact that he initially, at least, considered defendant to be like a big brother and later was threatened by defendant with the possibility of his own criminal liability. Finally defendant suggests it was improbable that defendant would allow a search of his apartment with so many incriminating items in plain view. This suggestion attacks the credibility of the police as well as Goodrum. Again the jury resolved this credibility determination, and we do not find that it was so improbable or contrary to the weight of the evidence as to require reversal.

■■ The testimony of Walter Goodrum was clear and was essentially uncontradicted, with the exception of the omissions in his initial statements to the police. His account was not improbable and we find no basis for substituting our judgment as to the truth of it for that of the jury which was able to observe his demeanor as he testified.

## II.

But defendant also contends that the State violated his right to a fair trial by improperly introducing evidence of his alleged involvement in several unrelated crimes. Those crimes were the two burglaries of Anderson's apartment committed prior to his death, and the kidnapping of Goodrum one month after the death.

■■ Our summary of the evidence and arguments presented at trial has established that the State did present extensive testimony concerning the details of the kidnapping of Goodrum. Over defense objection many items of physical evidence which related only to this kidnapping were introduced and were submitted to the jury. In addition, in opening and closing arguments to the jury the prosecutors detailed the facts of the kidnapping. As a general rule evidence that a defendant has committed an offense which is separate and distinct from the offense for which he is being tried is not admissible because of its prejudicial effect. (*People v. Fuerback* (1966), 66 Ill. App. 2d 452, 214 N.E.2d 330.) That evidence may be admitted, however, if it is relevant to show motive, intent, identity, absence of mistake, or modus operandi. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) It has also been permitted where necessary to explain the circumstances of the crime which would otherwise be unclear or improbable. *People v. Sutton* (1976), 43 Ill. App. 3d 1008, 357 N.E.2d 1209; *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269; see *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288.

■■ On appeal the State contends that the evidence of the kidnapping was relevant to the question of defendant's identity and also explained the circumstances of the crime charged. We find no basis for the suggestion that this evidence helped to establish defendant's identity. An example of

such use of other-crime evidence is found in *People v. Davis* (1958), 14 Ill. 2d 196, 151 N.E.2d 308. That was a robbery trial in which the defense challenged the ability of the complaining witness to identify the defendant because of the lighting conditions at the time of the robbery. It was held that under these circumstances it was not error to permit testimony by the witness that she had been robbed by the defendant on prior occasions, because this was relevant to her ability to identify him. Here there was no issue of misidentification; the witness was a friend of the defendant and had known him for some time prior to the time of the offense. The State has not suggested the precise manner in which this testimony was relevant to the question of identity, even assuming identity was an issue, and we perceive none.

The second basis of relevance for this evidence advanced on appeal by the State is that it explained the circumstances of the murder. Again we find no such relevance. The crime itself occurred a month before the kidnapping. The victim of the murder was of course in no way involved in the kidnapping. No details of the murder itself were explained by any of the testimony or physical evidence of the kidnapping. The case is thus distinguishable from *People v. Sutton* (1976), 43 Ill. App. 3d 1008, 357 N.E.2d 1209, cited by the State. In *Sutton* the victim of the aggravated assault at issue testified that the defendant approached him and told him the money he had given her was counterfeit and then threatened him with a gun. This testimony was held to have been properly explained by the witness' account of an incident the day before in which the defendant demanded and received money from him after waving a bag containing a gun. And in *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269, the otherwise improbable ease with which a Federal agent was able to buy heroin from the defendant by simply walking up to him and giving him money for it was held to have been properly explained by testimony that the agent had been involved in a prior purchase from the defendant without apparent harm to the defendant. The State has pointed to no such otherwise improbable or unclear testimony concerning the murder in this cause. The case of *People v. Schubert* (1975), 28 Ill. App. 3d 599, 329 N.E.2d 23, cited by the State for the proposition that events surrounding an arrest of a defendant are admissible although they disclose the commission of other crimes, is distinguishable on its facts. The State witness in that case testified that after she observed the defendant and others steal items from a number of cars, they secreted the items in her apartment, to which defendant had a key. Some time later she found the apartment vandalized. She reported this to the police and when they came and discovered some of the stolen items she told them of the earlier incident. While they were there the defendant drove by and was chased and apprehended. The reviewing court found that the vandalism was not

connected to the defendant, but also noted that circumstances surrounding an arrest are admissible even when another offense is revealed if those circumstances connect the defendant to the crime at issue. In this cause the evidence of the murder was found in the defendant's home; there was no need to explain their presenee in the home of a third party. And if the State wished to explain how they discovered these items they could merely have related defendant's consent to their search request, thus avoiding any prejudice arising from disclosure of another offense. The requirement that such prejudice be avoided where possible is illustrated by the case of *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 214 N.E.2d 330, in which the State rebutted the defendant's alibi claim that he was with his mother in her home at the time of the robbery at issue by adducing testimony that during part of that time he committed another robbery in a store. On review the court found that it would have sufficed to have the witness testify that she saw the defendant in the store at the time in question; the testimony detailing the second robbery was held to be prejudicial error.

On oral argument the State has advanced the theory that the kidnapping evidence tended to show an attempt by defendant to cover up his earlier crimes. Evidence that a defendant has attempted to conceal or suppress evidence is admissible as tending to show consciousness of guilt. (*People v. Roberts* (1922), 306 Ill. 240, 137 N.E. 802.) And such evidence is admissible even though those efforts may constitute a separate offense. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) But in this cause there is nothing to support such a conclusion. The testimony at trial expressly indicated that defendant's kidnapping scheme was a money-raising venture. Although at the time of the kidnapping he threatened Goodrum, this threat was directed towards any attempt by Goodrum to tell of the *kidnapping*. The State has pointed to nothing in the record supporting its theory and we find no basis for it.

■■ The one remaining purpose of this evidence, not advanced by the State on appeal, but repeatedly cited by them as the basis for it at trial, was to bolster the credibility of Goodrum. In argument to the court below on defendant's objections to kidnapping evidence, and indeed in argument to the jury the State repeatedly asserted that the evidence of the kidnapping, especially the physical items, tended to show that Walter Goodrum was telling the truth. Yet the Supreme Court of Illinois, in *People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288, has specifically held that evidence of other crimes may not be used to enhance the credibility of a State witness. In *Romero* the defendants were accused of burglary and theft and were convicted on the basis of the testimony of one State witness who claimed to have overheard them admit these crimes and who had seen them with the stolen property. The witness was

also permitted to testify that he later accompanied the defendants into a town and discovered that they were planning another burglary. He informed a State trooper of the previous burglary and of this plan. Police testimony corroborated this testimony as to his having reported the matter and also corroborated it by establishing that defendants were subsequently apprehended with burglary tools in their possession. The sole basis for this testimony advanced on appeal by the State was to bolster their witness' credibility. The supreme court rejected this exception for witness credibility and further found its use to have been reversible error as the conviction was based solely on this witness' testimony. In the case at bar the conviction of the defendant was clearly based on the testimony of Goodrum. Much of his testimony consisted of the details of the kidnapping. Of the three other witnesses testifying at trial the testimony of two of them, Patsy Brown and Thomas Dowd, was substantially about the kidnapping. Their testimony and the physical evidence of the kidnapping such as the ransom notes were advanced by the State as evidence of the credibility of Goodrum and thus cannot be considered to be merely harmless error. For these reasons the conviction of the defendant must be reversed and the cause remanded for a trial in which no such prejudicial evidence is used.

Although this basis alone requires reversal, we also consider the other contentions of the defendant which raise matters which may reoccur on retrial.

## III.

Defendant also complains of the evidence of prior burglaries admitted over his objection. But as we have noted, one exception to the general rule excluding such evidence is where it shows a common scheme or design. Thus in *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489, the defendant was convicted of a burglary which also involved an attack on the victim. The court on review held it was proper to allow testimony that three days later the defendant attacked another woman in a similar manner: both occurred in the early morning, he gained entrance in the same manner, used the same manner of attack on the women, and wore the same type of clothes. Here the defendant was on trial for an occurrence in which he entered the apartment of his landlord, stole his money and then killed him. The testimony of two other burglaries established that twice before the defendant had entered the landlord's apartment and taken certain items. Both times he used a key. In the occurrence at issue there was evidence that defendant again used the door to enter, and Goodrum reported that when they left defendant locked the door, thus indicating he had a key. This was evidence of a common scheme and justified the evidence of other crimes, including the physical

items which Goodrum specifically mentioned they took. However, this did not support the admission, over defense objection, of other items belonging to the victim which were found in defendant's apartment but not specifically linked to this pattern of entry and theft. Because of our determination of the issue concerning kidnapping evidence we need not determine whether the admission of these other items (Anderson's C.T.A. card, and photographs of his will and certificate of deposit) constituted independent reversible error.

## IV.

Over defense objection Investigator Dowd was permitted to testify that he contacted the State's Attorney's office to place a charge against the defendant. We find no prejudice arising from this testimony. This testimony is not analogous to the remarks of the prosecutor in *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256, cited by defendant, in which the prosecutor pledged his personal reputation and that of his office on the veracity of a State witness. The statement here merely informed the jury that charges were placed against the defendant, something they cannot have escaped knowing from the initiation of trial when the indictments were read to them. See *People v. McNight* (1979), 72 Ill. App. 3d 136, 390 N.E.2d 379.

## V.

Because of our disposition of this cause it would be inappropriate to consider defendant's contention that his sentences were excessive.

## VI.

■■ Defendant also contends, however, that the sentences were improperly based on consideration of the prior burglaries and the kidnapping which the prosecutor noted in his argument in aggravation. Defendant suggests that this constituted evidence of bare arrests or encounters with the law which did not result in convictions and which therefore should not have been considered in sentencing. (*People v. Perry* (1976), 38 Ill. App. 3d 81, 347 N.E.2d 340; *People v. Jackson* (1968), 95 Ill. App. 2d 193, 238 N.E.2d 196.) The State counters that where, as is the case in this cause, the other offenses have been detailed in testimony which was subject to cross-examination they may be considered in sentencing. (*People v. Lemke* (1975), 33 Ill. App. 3d 795, 338 N.E.2d 226; *People v. Davis* (1976), 38 Ill. App. 3d 649, 348 N.E.2d 533; *People v. Barksdale* (1976), 44 Ill. App. 3d 770, 358 N.E.2d 1150. But see *People v. Poll* (1979), 74 Ill. App. 3d 534, 391 N.E.2d 1125.) We disagree with both analyses. The references were to more than the bare arrests or statements of encounters with the law disapproved in *Perry* and *Jackson*. At trial these

other offenses were set out in some detail. But we do not find that this was sufficient to permit this evidence to be considered in sentencing. In *Lemke, Davis,* and *Barksdale,* the testimony as to other crimes was elicited at the sentencing hearings for the specific purpose of serving as evidence in aggravation. Here the evidence was introduced over defendant's objections at trial. He cannot be said to have been permitted a full presentation of the facts and free cross-examination where he was actively contesting the very admission of this evidence and was not informed it would be used at the sentencing hearing. We therefore hold that this evidence was inadmissible at the sentencing hearing because defendant was not afforded a full opportunity at that time for presentation of the facts and for cross-examination of witnesses. Although we need not reach the question of prejudice, we note that there was no objection to this evidence and no ruling by the trial judge as to its admissibility. Under such circumstances the trial judge is presumed to recognize any incompetent evidence and to have disregarded it. (*People v. Fuca* (1969), 43 Ill. 2d 182, 251 N.E.2d 239; *People v. Handley* (1977), 51 Ill. App. 3d 68, 366 N.E.2d 405.) Nor do we find this presumption to have been overcome by the trial judge's general statement that he had considered the evidence in aggravation.

The judgment of the trial court is reversed and the cause remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

JIGANTI, P. J., and LINN, J., concur.