THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDDIE MAXWELL, Defendant-Appellant.

Second District   No. 83—1113

Opinion filed January 28, 1985.

G. Joseph Weller and Nicholas Kritikos, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Eddie Maxwell, was found guilty after a jury trial of attempted murder, attempted armed robbery and aggravated battery. The trial court vacated the convictions of the latter two offenses and sentenced the defendant to an extended term of 40 years' imprisonment for attempted murder. The defendant appeals, contending that the State failed to prove beyond a reasonable doubt the existence of the requisite mental state for the offense of attempted murder, challenging the admission of evidence that the victim suffered clinical death some 14 hours after the offense and asserting that the sentence must be reduced as disproportionate in severity to that received by a codefendant.

On March 28, 1983, 78-year-old Laurence J. Schmidt was working alone in the offices of the Rockford Civic League, where he was employed part-time. The offices were located on the sixth floor of an office building on North Main Street in Rockford. Sometime after Mr. Schmidt returned from lunch, the defendant and a companion, Nathaniel Ingram, entered the office. When Mr. Schmidt approached them, one of the individuals inquired about the location of a barbershop. At that point, Mr. Schmidt was struck repeatedly with the leg from a broken chair. He raised his left arm in an effort to ward off the blows and his arm was broken as he endeavored to protect himself. In the course of the beating he suffered multiple blows to the head, causing no cracks or fractures but resulting in substantial internal bleeding to the left hemisphere of the brain.

After the defendant and Ingram fled, Mr. Schmidt was taken to St. Anthony Hospital where, during the night, his cardiovascular system progressively deteriorated. At 4:30 a.m. on March 29, his heart stopped beating and he stopped breathing, a condition which his doc-

tor described as "the equivalent of a person dying." Mr. Schmidt was revived following two hours of treatment. It was the doctor's opinion that the injury sustained in the beating was directly responsible for the deterioration and eventual cessation of Mr. Schmidt's heart and breathing.

Rockford police officers obtained a manila envelope bearing the defendant's palm print and the chair leg from the office where the beating had occurred. Defendant was arrested on May 20, 1983, and interrogated concerning the offense. After being advised of his *Miranda* rights and executing a waiver, the defendant made a written statement in which he stated that he had gone to downtown Rockford on March 28 in the company of Nathaniel Ingram. They walked around the mall looking at stores, and admired the gold rings on display in a jeweler's. As they continued to walk, Ingram said, "Man, I feel vicious. I feel vicious. I'm going to do something. I'm going to do something." As they came to the office building where the offense occurred, Ingram indicated that he wished the defendant to serve as a lookout, and defendant watched for Ingram as they progressed along the halls from floor to floor.

When they arrived on the sixth floor, Ingram told the defendant, "Wait a minute. Wait a minute. I know where this man bees [*sic*] in his office all the time." The pair walked along to an office where an old man was seated behind a desk, reading the newspaper. Ingram kept looking in and saying, "Man, oh man," as the defendant was trying to see in. The pair then walked away from the office to a stairway, where Ingram told the defendant to wait and tell him if anyone came. Ingram said he was going back to the office. The defendant next heard a lot of noise and someone hollering. He ran to the door and told Ingram to come on. When the defendant looked in, the club was on the floor and Ingram was choking Mr. Schmidt and trying to get his coat off. The defendant again urged Ingram to come on and took off down the hall. Ingram caught up to the defendant, and the two men walked down to the street. There they started walking, playing like nothing had happened. Defendant denied that Ingram told him anything or gave him any money. "I was so scared about what he did that I never did ask him for any money."

The defendant identified the chair leg which had been used in the beating. He denied having seen it before, or knowing where it had come from. Upon being advised that the police intended to search his home, the defendant advised them that they "would possibly find the rest of this chair underneath the back porch of his home." Other pieces of the chair were in fact recovered from beneath the porch.

The defendant testified in his own behalf that he went window shopping with Nathaniel Ingram in downtown Rockford on March 28. When they passed the office building, Ingram suggested going inside and the defendant, who needed to use the bathroom, agreed. They progressed from floor to floor, but all the bathrooms were locked. On the sixth floor, they encountered a woman who told them that they would need to get a key from one of the offices in order to use the bathroom. Ingram led the defendant to the offices of the Rockford Civic League, where the defendant saw Mr. Schmidt through the open door. When the defendant approached to inquire about the bathroom, Ingram struck Mr. Schmidt with the stick. The defendant panicked, turned toward the door and told Ingram to get out of there. The defendant began running down the hall, hearing Schmidt hollering, and ran all the way down the stairs before hearing Ingram coming down after him. The defendant left the building before Ingram overtook him, and the two proceeded toward the mall. The defendant testified that he had related this version of events to the interrogating detectives, and that he had not read the written statement prepared during the interrogation before signing it. He denied having the wooden chair leg with him at any time on March 28, or having known that Ingram had it before the attack on Mr. Schmidt. Ingram had never told the defendant what he planned to do in the office or asked for the defendant's help. He denied having agreed to serve as Ingram's lookout, and as having recognized the chair leg as coming from his house. However, the defendant had a lot of sticks lying around in his yard and thought that if the police looked they might find something similar to the chair leg used on Mr. Schmidt. He had no idea how Ingram obtained the stick from under his porch. He had believed that Ingram's statement about feeling vicious and going to do something was just a figure of speech.

■ The defendant initially asserts on appeal that there was insufficient evidence of his intent to kill the victim in this case to permit his conviction for attempted murder to stand. The defendant's assertion is based upon his analysis of the number of blows struck, the relative suitability of the weapon employed for causing deadly injury and the nature and extent of the injuries inflicted, all of which he finds sufficiently indicative of an intent merely to rob as to fail to establish beyond a reasonable doubt that the defendant further intended to bring about his victim's death.

A conviction for the offense of attempted murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—4) must be supported by proof that the defendant had the specific intent to kill the victim. (*People v. Myers* (1981), 85

Ill. 2d 281, 289.) Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances including the character of the assault, the use of a deadly weapon and other matters from which an intent to kill may be inferred. (*People v. Anderson* (1982), 108 Ill. App. 3d 563, 566.) Once the elements of an attempt are complete, abandonment of the criminal purpose is not a defense. *People v. Myers* (1981), 85 Ill. 2d 281.

The defendant asserts that the wooden chair leg chosen for use in the instant case "falls far short of being a weapon of choice for murder," being less suitable for causing deadly injury than such possible alternates as a baseball bat or a length of pipe. Thus, he concludes that it was not an instrument of such deadly character that its use necessarily implies an intent to kill. He also notes that photographs of the scene reveal the presence of a large pair of dagger-like scissors, assertedly a weapon more suitable for inflicting a fatal injury, in plain view on the office desk. The defendant argues that the failure to employ so available a weapon negates the existence of an intent to kill. Furthermore, the defendant claims that the failure of the assailants to complete their alleged act, leaving the victim conscious, mobile and calling for help, demonstrates that there was no intent to kill in the present case.

In analyzing the defendant's challenge to the sufficiency of the evidence, we conclude that there was sufficient proof of the requisite intent to establish guilt beyond a reasonable doubt. In arriving at this conclusion, we consider the body of circumstantial evidence marshalled by the State in its entirety, rather than as separate facts which, viewed alone, may be susceptible of innocent interpretations. We cannot agree with the defendant's assertion that the selection of a chair leg for a weapon in itself tends to indicate a design other than that to inflict a fatal injury. Certainly, a solid length of wood when used as a bludgeon and swung against the head both violently and repeatedly is manifestly an implement capable of taking human life. That defendant and Ingram did not arm themselves with some more inherently deadly instrument or employ the scissors on the desk is immaterial. The jury, finding that the intent to kill had been proved, was not required to speculate as to whether some other potential weapon was as readily available or as easily concealable as the chair leg, or as to whether the two offenders were content that the weapon chosen was adequate for their purpose.

Further, while the defendant views the manner of the attack as indicating an absence of the intent to kill, the same facts give rise to a contrary conclusion. The victim was 78 years old and was con-

fronted by two individuals whom the State has aptly characterized as "sturdy youths." Not only had he offered no resistance, he had not been apprised that any type of offense was contemplated by his assailants at the time he was attacked. Mr. Schmidt's purely defensive reaction to the assault constituted a demonstration of his inability to offer meaningful resistance, and the continuation of the attack thereafter, done with sufficient force to fracture the arm with which the victim sought to protect his head, was evidence from which the jury could reasonably conclude that the attackers sought to silence their victim by killing him. The fact that the defendant and Ingram broke off their attack before achieving their purpose may well have been viewed by the jury as indicating only that they had become frightened by the victim's continued calls for help in an office building where potential rescuers were present. The fact that an assailant, armed with a deadly weapon, chooses to flee when his victim cries for help, rather than choosing to inflict a fatal injury, does not negate the existence of the intent to kill. (*People v. Anderson* (1982), 108 Ill. App. 3d 563.) Moreover, it is anomalous for the defendant to claim that the nature and extent of the victim's injuries are inconsistent with an intent to kill when those injuries in fact resulted in his clinical death. While the lack of cracks or fractures on the skull must be considered, the fact that the blows struck caused a severe intercranial hemorrhage amply evidences the violence with which the blows were inflicted. Contrary to defendant's position, this conclusion is not based upon consideration of the subsequent or collateral effect of injuries, but rather represents a deduction regarding the violence employed on the basis of the direct consequences of its infliction.

■ The defendant next contends that the trial court committed reversible error in allowing medical testimony that Mr. Schmidt experienced clinical death some 14 hours after the beating. The defendant construes this testimony as irrelevant to any issue in the case and extremely prejudicial in that it served solely to inflame the passions of the jury and focused their attention on an irrelevant factor. Defendant maintains that the medical testimony can be divided into two parts dealing with the nature and extent of the injuries and the subsequent effects of those injuries. The defendant concedes the admissibility of evidence in the first category (see *People v. Chatman* (1982), 110 Ill. App. 3d 19), but contends that evidence regarding Mr. Schmidt's clinical death fell into the latter category and was improperly admitted.

In the cases upon which the defendant relies (*People v. Nickolopoulos* (1962), 25 Ill. 2d 451; *People v. Johnson* (1979), 76 Ill. App. 3d 147), the weapon in question was a firearm, a deadly weapon *per se*,

so that the intent to kill can be found from its use irrespective of the extent of the injuries inflicted. In such a case, inflammatory evidence regarding the nature of the wounds or the consequences of the crime may not properly be admitted. However, in the instant case the weapon employed was not inherently deadly, and whether it was used with the intent to kill required an analysis of the manner in which it was employed. Specifically, the jury was required to evaluate whether the chair leg was swung with such force that the assailant necessarily intended to kill his victim. In such circumstances, the nature and seriousness of the injury are considered essential elements of the charge. (*People v. Chatman* (1982), 110 Ill. App. 3d 19; *People v. Goodwin* (1980), 83 Ill. App. 3d 203.) Here, where an evaluation of the nature and extent of the injuries inflicted was critical to determining the intent with which the blows at issue were inflicted, and where descriptions of the injury as an intercranial hemorrhage with a large amount of bleeding inside the brain tissue may not have adequately explained the force with which the injury was inflicted, testimony that Mr. Schmidt's essential life functions ceased as a direct result of the blow was properly admitted as relevant and explanatory of the nature and extent of the victim's injuries.

The State further contends that evidence of the victim's subsequent medical treatment was relevant because instructions on the lesser included offense of aggravated battery were tendered to the jury by defense counsel. The State argues that such evidence is relevant on the issue of bodily harm, an element of the lesser offense. (*People v. Tiess* (1981), 97 Ill. App. 3d 45.) Defendant counters the State's argument by suggesting that defense counsel's tendering of the instruction merely represented an attempt to minimize the negative impact of the disputed evidence and therefore cannot justify evidence of the victim's clinical death. We disagree with this facet of defendant's argument, for its acceptance would place attorneys and trial judges in a position where the propriety of admitting evidence was dependent upon the subsequent decision as to whether instructions on certain lesser offenses were to be given to the jury. Our view is that if the evidence is relevant upon a lesser offense properly included within the offense charged, evidence tending to bear on that offense may be admitted before the jury. In any event, we do not believe that the test for admissibility of evidence of the victim's condition is markedly different in a prosecution for aggravated battery than in one for attempted murder where an implement other than a deadly weapon *per se* has been employed. Where the finder of fact is required to evaluate the nature and seriousness of the injury, the evi-

dence in question should be admitted. (*People v. Nard* (1975), 32 Ill. App. 3d 634.) We find the trial court did not err in the admission of this evidence.

■ Finally, the defendant attacks the 40-year sentence imposed upon him as disproportionate in its severity to the sentence of 25 years given to Nathanial Ingram. Asserting that his degree of participation in the offense and personal background were less culpable than Ingram's, defendant states that the sentence adjudged in his case reflects the fact that he contested the charges against him, while Ingram "was able to achieve a non-adversarial relationship with the State."

Fundamental fairness and respect for the law require that defendants similarly situated not receive grossly disparate sentences, but a disparity in sentencing may be supported by a more serious criminal record or greater participation in the offense than the individual with whom the defendant's conduct is compared. (*People v. Godinez* (1982), 91 Ill. 2d 47; *People v. Cook* (1983), 112 Ill. App. 3d 621; *People v. Patterson* (1981), 100 Ill. App. 3d 207.) An accused may not be punished for exercising his right to trial (*People v. Sivels* (1975), 60 Ill. 2d 102; *People v. Peddicord* (1980), 85 Ill. App. 3d 414), but if a disparity in sentencing is attributable to a codefendant's plea of guilty to a lesser offense, the negotiated plea does not provide a valid basis of comparison. *People v. Bennett* (1980), 90 Ill. App. 3d 64; *People v. Wagner* (1979), 76 Ill. App. 3d 965.

In the instant case, the record indicated that the weapon used in the offense was obtained from beneath the defendant's porch and this fact, coupled with the falsehoods in the defendant's initial account of events and the subsequent contradictions between his written statement and his in-court testimony, provided a rational basis upon which the court could have concluded that the defendant's degree of participation in the crime was more extensive and culpable than that of Ingram, who entered a negotiated plea of guilty. Accordingly, we reject the defendant's attack upon the sentence imposed in his case.

For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

LINDBERG and STROUSE, JJ., concur.