THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT McNUTT, Defendant-Appellant.

First District (5th Division)   No. 84—1878

Opinion filed July 18, 1986.

James J. Doherty, Public Defender, of Chicago (Thomas J. Knitter and Aaron L. Meyers, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Thomas P. Needham, and Thomas P. Riordan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, after findings of guilt, defendant was sentenced to concurrent terms of 25 years for attempted murder, and armed violence and 3 years for unlawful restraint. On appeal, it is contended that (1) he was denied a fair trial by the admission of irrelevant and prejudicial evidence; (2) he was not proved guilty beyond a reasonable doubt; (3) he did not receive effective assistance of counsel; (4) the jury was improperly instructed; and (5) his convictions for

armed violence and unlawful restraint should be vacated as arising from the same conduct as was his conviction for attempted murder.

At trial, 16-year-old Detarie Harris testified that she was walking to her mother's house at about 8 a.m. on September 25, 1983, when Montique Kennedy, a local pimp she had known for 1½ years, called to her by her nickname—"Dee Dee"—from across the street. As she continued walking, Kennedy drove up beside her in a blue Cadillac. He and three other men jumped out, forced her inside and then took her to Kennedy's apartment where defendant's sister, Linda McNutt ("Little Bit") and a woman named Michelle ("Micky"), both of whom worked as prostitutes for Kennedy, were also staying. She remained there for nearly three weeks during which time defendant made daily visits to see Kennedy.

Toward the end of the second week, she deliberately took an overdose of pills she found in the apartment, hoping that she would be hospitalized and thereby escape from him; but when he took her to the emergency room, he told hospital personnel that he was her legal guardian and, after treating her, they released her to his care.

On or about October 6, Kennedy took her out in his Cadillac—to which he had affixed the names "Little Bit," "Micky," and "Dee Dee"—to solicit men in cars for prostitution. As instructed by him, she flagged down one such car, but when she got in, she asked the man to take her to the Congress "L" station from which she ran to her mother's house. After learning what had occurred, her mother telephoned her father and the police and later signed a complaint against Kennedy.

On November 2, two of her friends, whom she had told of her abduction by Kennedy, beat him up at the funeral of a mutual acquaintance. Later that night, as she was walking home alone, he came up to her and said, "Come on, let's take a walk and talk." When she began to cry and back away, he grabbed her by the neck but, after a struggle, she broke free and ran. At that point, Kennedy, Linda and defendant each drew a gun and Kennedy threatened that she would be shot if she did not stop. He then grabbed her and took her to his apartment, repeatedly questioning her as to why she had caused a warrant to be issued for his arrest. When they arrived at his apartment, he instructed Linda to telephone her (Harris') father and tell him to pick her up. He then told her, "I'm not going to let no 16-year old young bitch send me to the penitentiary," to which defendant assented, telling her that he could not let her send "his man" to jail. About 20 minutes later, Linda returned and said that her father had agreed to meet them in the park. They left Kennedy's apartment, but

instead of going to the park, they forcibly led her to an abandoned building where Kennedy then asked her to have sex with him. When she refused, he ordered her to go upstairs whereupon he threw a knife at her and then ordered her to pick it up and "go for what you know." She retrieved the knife and came toward Kennedy with it but before she reached him, defendant came up behind her and pinned her arms against her chest while Kennedy put something—which felt like some type of rope or cord—around her neck and began choking her. He then pushed her up against the wall causing her to fall and drop the knife. As she was lying on the floor, defendant sat on her ankles and began stabbing her in the legs while Kennedy and Linda repeatedly hit her about the face and chest. Kennedy then ordered Linda to give him the knife she had dropped and, as defendant continued to hold her down and stab her in the legs, Kennedy and Linda began stabbing her face, neck and arms. A short time later, they heard the voice of a man calling out from the stairway, "Who is that? What's going on?" whereupon Kennedy, Linda and defendant ran out of the building. Although she could not recall the details, the stranger whose voice they heard came into the apartment where she was lying and somehow took her downstairs, after which the police and an ambulance were summoned.

She underwent surgery that morning and then again two weeks later for injuries caused by the multiple stab wounds. At the time of trial, in June 1984, she was still receiving treatment for the scars and swelling resulting from the stab wounds and was deaf in one ear. She identified various exhibits, including the knife Kennedy used to stab her, a whip she had seen in his apartment, the clothes she wore that night and several photographs of the abandoned building.

Officer Schulz testified that when he arrived at the building, he heard someone calling for help and saw a shabbily dressed man standing over Harris, who was lying in a pool of blood from numerous cuts on her face, arms and legs. She was semi-conscious and, from her moaning, appeared to be in considerable pain. Due to her condition, she was able to give only short answers to his questions. When he asked her who was responsible for her injuries, she said "Que"—Kennedy's nickname—and "Little Bit"—referring to Linda. At that point, the ambulance arrived and transported her to the hospital. Upon inspecting the upstairs apartment, he found an electrical cord, a pipe, a whip and a knife and saw that there was blood "all over the floor." Although he briefly interviewed Harris at the hospital later that morning, the focus of his questions was on learning her identity rather than on gathering additional information about her assailants.

On defense, Jerome McNutt, defendant's brother, testified that on the night of November 2, he, defendant and two friends were sitting on his front porch drinking beer. At about 11 p.m., when he and his friends decided to take a walk, defendant went inside. He (Jerome) returned home at about 2:30 and saw defendant asleep in the room they shared. On cross-examination, Jerome acknowledged that he did not tell the police that defendant was at home that night and, in fact, had refused to speak with a sheriff's officer who came to the house after defendant's arrest to talk to him about the case.

Rosemary McNutt, defendant's mother, also testified that defendant came in the house at about 11 p.m. and that at 3 a.m. and again at 4:30 a.m., when she arose to check on her young grandson, he (defendant) was asleep in his bed. She next saw defendant at 5:30 a.m. when she left for work. On cross-examination, Mrs. McNutt stated that she did not tell the police that defendant was at home on the night in question because they did not ask her.

Following closing argument, defendant was found guilty and sentenced on all charges. His post-trial motion for a new trial was denied, and this appeal followed.

OPINION

Defendant first contends that he was denied a fair trial by the admission of evidence relating to various crimes committed by others prior to the occurrence of the crimes at issue. Specifically, he argues that the testimony of Harris that she was abducted by and forced to engage in prostitution for Kennedy, as well as that concerning her attempted, and eventually successful, escape from him, the warrant issued for his arrest and the beating inflicted upon him by her friends, was not only irrelevant but so prejudicial that its admission constituted reversible error. The State's primary responsive argument is that defendant has waived review of this issue by failing to object to the evidence at trial.

■ The general rule is that the failure of trial counsel to make a timely objection to the introduction of evidence operates as a waiver of the right to have the propriety of that evidence reviewed on appeal. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

In the instant case, because Harris' testimony was not objected to at trial, under the general rule, any error in its admission ordinarily would be deemed waived. Defendant maintains, however, that his trial attorney's failure to preserve the issue for review is but one of sev-

eral deficiencies in his performance constituting ineffective assistance of counsel—an issue we discuss further below—necessitating reversal of his convictions under the plain-error doctrine embodied in Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)).

■ Although Rule 615(a) provides an exception to the waiver rule by allowing a reviewing court to take notice of "plain errors or defects affecting substantial rights" which were not brought to the attention of the trial court, it is a limited exception, not a general savings provision, and may be invoked only where the evidence is closely balanced or where the error was of such magnitude as to deny the accused a fair trial (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), neither of which is the situation in this case.

■ It is well settled that evidence of other crimes is admissible if it is relevant for any purpose other than to show defendant's bad character or propensity to commit crime (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821; *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269), such as to show motive, *modus operandi*, knowledge, identity, absence of mistake, criminal intent, defendant's state of mind or the circumstances of his arrest (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821), a common design or plan, preparation, opportunity, consciousness of guilt, whether the crime was actually committed, or defendant's dislike of the victim (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292), as well as to disprove a defense of entrapment or alibi or to provide an explanation of the circumstances of the crime, without which it otherwise would be unclear, implausible or improbable (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292; *People v. Turner* (1979), 78 Ill. App. 3d 82, 396 N.E.2d 1139).

■ Although the evidence at issue might, arguably, have been relevant for several of the above-stated purposes, we believe that it was most relevant for the purpose—as explained by the prosecutor in opening remarks—of providing a framework within which the details of the crimes could be understood by the jury and to establish a motive for their commission, and therefore find that it was properly admitted.

Defendant further contends that evidence relating to the nature and extent of Harris' injuries, the medical treatment she received therefor, the squalor of the abandoned building in which the stabbing occurred and the various weapons recovered by the police was also irrelevant and prejudicial in that its introduction at trial and use by the prosecutor in closing and rebuttal arguments served only to inflame the passions of the jurors.

Initially, we note that as with the evidence discussed above, no objections were interposed at trial to the admission of the testimony, exhibits and arguments defendant now challenges. Therefore, any error in this regard must be considered waived. *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292.

■ In any event, we have carefully reviewed defendant's exhaustive argument on this issue—in which he points to several dozen instances of allegedly improper evidence and argument through the reiteration of lengthy excerpts from the trial transcript—and conclude that for the most part, the evidence, including that regarding the nature and severity of her injuries, was relevant and, therefore, admissible, to prove that defendant intended to commit murder and that he took substantial steps toward that objective (*People v. Maxwell* (1985), 130 Ill. App. 3d 212, 474 N.E.2d 546; *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292); and that the few instances where the relevancy of evidence or the propriety of prosecutorial remarks thereon was questionable were not so prejudicial as to amount to reversible error.

Defendant also contends that he was not proved guilty beyond a reasonable doubt. He first argues that reasonable doubt existed as to Harris' credibility with respect to her in-court identification of him by reason of (a) Officer Schulz' testimony that when he asked her who was responsible for her injuries immediately after the incident, she named only "Que" (Kennedy) and "Little Bit" (Linda), and (b) the absence of any physical evidence at the scene of the offense linking him to its commission.

■ ■ We have repeatedly held that the positive and credible testimony of a single witness identifying the defendant as the offender is sufficient to support a conviction (*People v. Nurse* (1985), 131 Ill. App. 3d 590, 475 N.E.2d 1000; *People v. Thomas* (1984), 121 Ill. App. 3d 883, 460 N.E.2d 402; *People v. Bibbs* (1981), 101 Ill. App. 3d 892, 428 N.E.2d 965), provided that he is observed under conditions which would allow a positive identification to be made (*People v. Reed* (1980), 80 Ill. App. 3d 771, 400 N.E.2d 688); and that such testimony is strengthened to the extent of the witness's prior acquaintance with him (*People v. Horobecki* (1977), 48 Ill. App. 3d 598, 363 N.E.2d 1; *People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982). Furthermore, assessments of the credibility of the witness and the weight to be accorded her testimony are matters within the province of the jury and will not be disturbed on review unless the evidence itself is so improbable or unsatisfactory as to create a reasonable doubt of

defendant's guilt. *People v. Nurse* (1985), 131 Ill. App. 3d 590, 475 N.E.2d 1000; *People v. Reed* (1984), 121 Ill. App. 3d 883, 460 N.E.2d 402.

■ In the light of Harris' uncontradicted testimony that she had known defendant for seven or eight months prior to the attack and that he made daily visits to Kennedy's apartment during the period she was detained there—which virtually negates the possibility of mistaken identity—together with her account of the attack—which was consistent with the stipulated medical evidence regarding the nature, extent and location of her wounds and, considering the ordeal she underwent, was remarkably detailed and cogent—we do not consider her failure to name defendant as one of the perpetrators when questioned by Officer Schulz at the scene to be of such significance as to raise a reasonable doubt of his guilt, particularly in view of her testimony that she had no recall of the events which transpired between the time she was brought out of the building by the passerby and her arrival at the hospital, which was supported by that of Officer Schulz who stated that when he came upon the scene she was lying in a pool of blood, moaning and mumbling in pain and "fading in and out of consciousness" and that it was just after she named Kennedy and Linda that the ambulance arrived.

■ Neither do we regard as material the absence of any physical evidence, such as a knife, fingerprints, clothing, hair, fibers or the like, in the apartment where the crimes took place linking him to their commission since the record clearly establishes that the apartment was not only vacant but in an advanced state of disrepair and strewn with rubbish. Furthermore, it is reasonable to presume that defendant would have taken the knife he used to stab Harris or other such items which could be traced to him when he fled the building.

■ Defendant also asserts that as to the attempted-murder charge, the State did not prove that (a) he intended to kill Harris but, at most, an intent to "intimidate, punish or disfigure [her]" or (b) her wounds were life threatening.

To sustain a conviction for attempted murder, the State must show that the accused acted with the intent to kill (Ill. Rev. Stat. 1983, ch. 38, par. 8—4; *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331); however, since intent is a state of mind, where it is not admitted it can be shown by surrounding circumstances and can be inferred from the character of the assault, the use of a deadly weapon and the overall circumstances of the crime (*People v. Maxwell* (1985), 130 Ill. App. 3d 212, 474 N.E.2d 46; *People v. Anderson* (1982), 108 Ill. App. 3d 563, 439 N.E.2d 65).

■■ Here, in addition to the evidence summarized above, the record reveals that defendant, Kennedy and Linda forced Harris at gunpoint into the abandoned building; that defendant told her he could not allow her to send Kennedy to jail; that he physically restrained her while Kennedy choked her; that he then sat atop her and repeatedly stabbed her in the legs while the others stabbed her about the face, neck and arms; that the assault continued until a passerby entered the building to investigate, prompting defendant and his companions to flee; and that she sustained multiple stab wounds, lost a considerable amount of blood and required immediate surgery, was sufficient evidence from which the jury could conclude that defendant intended to commit the offense of murder, and that he took substantial steps toward doing so, since it appears that her death was prevented because of the fortuitous intervention of the passerby and the prompt medical attention she received.

■■ Defendant next contends that the trial court erred in failing to include the phrase "without lawful justification" in the murder and attempt instructions, and to instruct the jury on the justifiable use of force in self-defense and the defense of others.

We note, however, that the Committee Note to Illinois Pattern Jury Instruction No. 7.01 (Illinois Pattern Jury Instruction, Criminal, No. 7.01 (2d ed., 1981)), states that the phrase "without lawful justification" is to be used "whenever an instruction is to be given on an affirmative defense contained in Article 7 of Chapter 38"—dealing with the justifiable use of force. Here, defendant relied on an alibi as his theory of defense. He neither raised nor tendered an instruction on self-defense or defense of others as an affirmative defense, and finding no evidence in the record warranting the giving of such an instruction, we see no error by the trial court in this regard.

■■■ We turn then to defendant's contention that he was denied his constitutional right to effective assistance of counsel, in support of which he specifies approximately 17 separate instances of allegedly incompetent performance by his trial attorney.

To establish a denial of one's constitutional right to a fair trial because of incompetency of counsel, a defendant must clearly establish not only that his attorney was actually incompetent in the performance of his duties but also that were it not for that incompetence, the outcome of the trial would likely have been different (*People v. Taylor* (1982), 110 Ill. App. 3d 1140, 443 N.E.2d 699). In determining the adequacy of counsel, a reviewing court will not focus on isolated instances of alleged deficiencies but, rather, must consider the totality of circumstances (*People v. Davis* (1981), 103 Ill. App. 3d 792, 431

N.E.2d 1210), since a defendant is entitled to competent, not perfect, representation (*People v. Martin* (1983), 112 Ill. App. 3d 486, 445 N.E.2d 795). Furthermore, we will not extend our review to areas involving the exercise of judgment, trial tactics or strategy, require counsel to perform futile acts, or indulge in speculation as to whether the outcome of the trial *might* have been different had representation been of a higher caliber. *People v. Conley* (1983), 118 Ill. App. 3d 122, 454 N.E.2d 1107.

    Here, the majority of defendant's allegations concern counsel's failure to object to the admission of the evidence challenged in this appeal as irrelevant and prejudicial. As noted above, however, the sole theory of defense was that while these crimes may have been committed in the manner charged by the State, he was not a participant in them, having been at home asleep on the night of their commission.[1] Thus, there was no reason for counsel to object to any of the evidence concerning how and where the assault and stabbing occurred or what injuries Harris sustained as a result thereof. Indeed, it may well have been counsel's judgment that to do so would antagonize the jurors and/or cause them to question the veracity of his alibi defense. This is a matter of trial strategy of the type beyond our review.

Furthermore, having previously determined that the evidence was generally relevant and, therefore, admissible, any objection by counsel to it at trial would likely have been overruled. As stated, counsel is not required to perform futile acts, nor, obviously, is his failure to do so reflective of incompetence.

Moreover, in reviewing the record in its entirety, we note that in advancing his alibi theory of defense, counsel made a concise opening statement acknowledging that Harris was the victim of a stabbing attack but insisting that defendant took no part in it; thoroughly cross-examined the two State witnesses, eliciting from Officer Schulz the favorable testimony regarding Harris' failure to name defendant as one of her assailants when questioned by him after the incident; presented two alibi witnesses to attest to defendant's whereabouts on the night in question; and made an effective closing argument in which he attacked Harris' credibility and posed the theory that jealousy and revenge were motivations for her fabrications. The fact that his efforts on behalf of defendant were not successful does not entitle defendant to a new trial on grounds of incompetency of counsel.

---

[1]We note, however, that at the sentencing hearing, defendant, in maintaining his innocence to the court, stated that he was at the dentist at the time of these crimes.

Finally, defendant contends that his convictions for armed violence and unlawful restraint should be vacated because they arose from the same conduct on which his conviction for attempted murder was predicated.

■■■ The State concedes, and we agree, that under *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, in which it was held that multiple convictions for both armed violence and the underlying felony on which it is based cannot stand where the same physical act is the basis for both charges, defendant's conviction for armed violence as a result of his participation in the stabbing of Harris was improper. We therefore vacate his conviction and sentence on the armed-violence charge.

■■■ In contrast, however, the record establishes that defendant committed the offense of unlawful restraint not only when he sat atop Harris' legs while he, Kennedy and Linda stabbed her, but also when he and his companions forcibly took her to the abandoned building and when, just prior to the stabbing, he came up from behind her as she was attempting to defend herself from Kennedy and pinned her arms against her body so as to prevent her movement and to allow Kennedy to place some type of rope or cord around her neck with which he then choked her. These acts being separate and distinct from those giving rise to the attempted-murder charge the trial court did not err in entering judgment on defendant's conviction for unlawful restraint.

For the foregoing reasons, we affirm defendant's convictions and sentences for attempted murder and unlawful restraint but vacate his conviction and sentence for armed violence.

Affirmed in part; reversed in part.

LORENZ and MURRAY, JJ., concur.