THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* KEVIN CALHOUN, Defendant-Appellant.

First District (5th Division)   No. 81—1258

Opinion filed August 3, 1984.

George C. Howard, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, James S. Veldman, and Timothy J. Joyce, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempted murder, armed robbery and aggravated battery. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 18—2 and 12—4, respectively.) The trial court merged the aggravated battery and attempted murder convictions and sentenced defendant to concurrent terms of 15 years for attempted murder and armed robbery. Defendant appeals, contending that: (1) the trial court erred in denying his motion to quash arrest and suppress his confession; (2) the trial court erred in allowing the State to introduce evidence of a separate crime; (3) the trial court erred in denying his motion *in limine* which sought to prevent the State from informing the jury that the victim is a Chicago alderman; (4) the trial court erred in denying his motion for a mistrial predicated upon the State's detailed account of the separate crime during its opening statement; (5) his admissions were not sufficient to establish his guilt beyond a reasonable doubt; and (6) the State's comments during closing argument regarding his failure to call his co-offenders to the stand prejudiced him and denied him a fair trial. We affirm.

The case at bar concerns charges brought against defendant under the theory of accountability for offenses committed against Frank Brady during the early morning hours of March 8, 1979 (Brady incident). In order to prove defendant's intent to promote or to facilitate the Brady incident, the State introduced testimony to show the common scheme, design and motive of the offenses committed against Brady and those committed a few hours earlier against Joseph Oswald (Oswald incident). Defendant was initially implicated in both inci-

dents by his co-offenders and subsequently confessed to his involvement.

Testimony elicited at trial indicated that on March 7, 1979, approximately 10 p.m., Joseph Oswald was exiting his 1975 brown Cadillac in the parking lot of Summer's West Restaurant in Evergreen Park when he was accosted at gunpoint by three young black males who forced him back into his car and pushed him to the middle of the front seat. One of the assailants sat on either side of him and another sat in the back. As the driver pulled out of the parking lot and headed north on Western Avenue, Oswald glanced in the rear view mirror and noticed that a yellow car containing two black males had followed them out of the parking lot and was driving on their left side. The assailants intended to turn right at 87th Street, but proceeded straight when they noticed an unmarked squad car turning right at that intersection. At that point, the yellow car turned left and did not return. While they were driving north on Western, the assailants robbed Oswald of $835. They then turned right at 83rd Street, pulled into a forest preserve parking lot, shot Oswald in the neck and threw him out of the car. After being released from the hospital, Oswald identified his three assailants as Victor Armon, Renaldo Crump and Bell. However, he was unable to identify the occupants of the yellow car.

A few hours later, Frank Brady left Summer's West Restaurant in his car and drove north on Western Avenue to a pizza parlor located at 71st and Troy. Just as Brady was getting out of the car, another car pulled up alongside of him and a black male, armed with a sawed-off shotgun, got out of the car and started walking toward him. Brady immediately got back into his car and sped away with the other car in pursuit. After driving up and down numerous streets, Brady thought he had lost his pursuers and drove home. However, just as he was getting out of his car in front of his house, two black males approached him, one armed with a sawed-off shotgun and the other with a pistol. The one with the pistol told Brady that this was a holdup and forced him back into the car, where one assailant sat on either side of him in the front seat. After Brady gave them $120, and they had stepped out of the car, Brady noticed that there were a couple of black males in the back seat of the car in which the assailants had been riding, but he did not get a good look at them. As they were standing next to the car, one of the assailants pointed the shotgun at Brady's stomach and told him that he was going "to blow him away." Brady then pushed the gun aside and started to run toward his house, but was shot in the back. Brady later identified his assailants as

Duane Dawkins and Victor Armon.

At the evidentiary hearing on defendant's motions to quash arrest and to suppress statements, Investigator Charles Roney of the Chicago Police Department testified that on March 8, 1979, approximately 5 p.m., he was assigned to the Brady case and informed that defendant had been named as an accomplice by one of the co-offenders already under arrest. He and his partner then proceeded to defendant's residence, arriving there approximately 6 p.m. Defendant's mother answered the door, the officers identified themselves, and told her that they were looking for defendant. Because she had just arrived home, she was not sure whether defendant was at home, and invited the officers to come upstairs while she checked. When she discovered he was not at home, Mrs. Calhoun asked if defendant was wanted in connection with the incident for which Crump had just been arrested. She had heard about Crump's arrest on the radio. Roney indicated that defendant was being sought in connection with that incident and told Mrs. Calhoun that they would return later that evening.

Approximately 10:30 p.m. the officers returned to defendant's residence, and his father answered the door and invited them to come upstairs and step into the living room where defendant was waiting. Roney told defendant why the officers were there, advised him of his rights, told defendant's parents where they were taking him and informed them that they could either accompany him or wait for defendant's phone call. They chose to do the latter. On cross-examination, Roney stated that he had never seen an arrest warrant for defendant and that he did not take notes of his conversation at defendant's residence.

Defendant's father, Lewis Calhoun, testified that on March 8, 1979, approximately 10:35 p.m., two plainclothes Chicago police officers came to the Calhoun residence looking for defendant. They did not have an arrest warrant. When Lewis opened the downstairs door of the two-flat, the officers, with guns drawn, "brushed by" him and went up the stairs to the Calhoun's second floor apartment. Although Lewis kept asking the officers what they wanted, they told him nothing more than that they were looking for defendant. Because the officers preceded Lewis into the apartment, Lewis did not know whether defendant came out of his bedroom to see the officers or whether the officers went into defendant's bedroom. In any event, they escorted defendant out of the apartment and into a waiting squad car. Neither Lewis nor his wife heard from defendant until approximately 2:30 a.m., when he called them from the police station.

On cross-examination, Lewis Calhoun stated that he had been

home earlier that evening when two Chicago police officers came to his residence looking for defendant. His wife had answered the door at that time and later told him that the police were looking for defendant to question him about "being in a car." Defendant was not at home at the time and the officers had indicated that they would return. Lewis denied that the officers had had his permission to enter his apartment, but admitted that there had been no violence, shouting or resistance.

Defendant testified that on March 8, 1979, approximately 10:30 p.m., he was awakened by two police officers standing in his bedroom with their pistols drawn. They told him to get dressed because they wanted to question him at police headquarters about driving a car. He was never shown a warrant. Defendant further claimed that he was never advised of his rights and that he gave his first statement to the police approximately 45 minutes after arriving at the station. Further, he was not allowed to call either a lawyer or his parents after he had made his statements.

On cross-examination, defendant stated that when he arrived home on the evening of his arrest, his mother told him that the police had been there, but she did not tell him that they were coming back. Prior to arriving at the police station, he was never informed as to why he was being arrested.

At trial, Investigator Joseph Gorman of the Chicago police department testified that he first saw defendant at police headquarters on March 8, 1979, at approximately 11 p.m. Earlier that day he had arrested Crump, who subsequently implicated defendant. Gorman advised defendant of his rights, told him that they had arrested several individuals who were involved in two armed robberies and shootings and that those individuals had all cooperated with the police. When Gorman asked defendant what he had to say about the Oswald incident, defendant told him that on March 7, 1979, he and four others left Danaldo Williams' house in a yellow Cougar and drove around looking for someone to rob. They pulled into a restaurant parking lot and waited until a man came out and got into his car. Defendant and Bruce Collins stayed in the car while the other three, armed with a pistol, got out, forced the man into his brown Cadillac, entered the Cadillac themselves, and drove off. Collins and defendant followed the Cadillac for a while, then turned off when they spotted a squad car. A short time later, the three assailants returned in the brown Cadillac without the victim. All five of them discussed what had happened and decided to "go out and get another one." They returned to the restaurant parking lot, saw a man leaving, and decided to follow him.

Collins and another person left the group after the first robbery, and Dawkins and Armon joined the group for the second robbery. When the man they were following stopped and parked his car, Dawkins and Armon, armed with a shotgun, robbed and shot the victim, after which all of them returned to 87th Street.

Investigator Dan Rolewicz of the Chicago Police Department testified that on March 8, 1979, approximately 5 p.m., during his interview with Victor Armon at police headquarters, Armon implicated defendant in the Brady incident and gave Rolewicz defendant's approximate address which was later verified through a record check and given to the arresting officers. Later that evening, approximately 11:30 p.m., Rolewicz interviewed defendant as to his knowledge of the Brady incident. Although defendant declined to give a written statement, he told Rolewicz that approximately 1 a.m. that morning, he and three others were riding around looking for someone to rob when they saw a white male leaving a lounge and getting into a red car. They followed him to where he parked his car and two of defendant's companions, armed with a sawed-off shotgun, got out of the car and walked toward the white male. When the potential victim spotted them, he pulled away. Defendant and his friends followed him to another location, where the same two individuals, armed with the sawed-off shotgun, got out of the car in which defendant was riding, robbed the man and then shot him in the back. All four of the offenders shared in the proceeds. Rolewicz further stated that he saw defendant again approximately four hours later in one of the interrogation rooms where he was being shown the weapons confiscated at Dawkins' apartment. On cross-examination, Rolewicz indicated that he did not take notes during defendant's statement, nor did he tape record it.

Officer John Brines of the Evergreen Park police department testified that because Summer's West Restaurant is located in Evergreen Park, he was working with the Chicago police on the investigation of the Oswald incident. In this capacity, on March 8, 1979, approximately 11 p.m., Brines received a phone call from the Chicago police informing him that defendant was in custody, and that he had given a statement regarding the Oswald incident. Brines immediately drove to the Chicago police station and interviewed defendant, who told him that his friends, Crump, Armon, Bell and Collins picked him up at his house on the evening of March 7, 1979, in a yellow Cougar and the five of them drove around for a short time, eventually stopping in the parking lot of Summer's West Restaurant. When Oswald pulled into the parking spot next to them, Crump, Collins and Bell forced Oswald

back into his car, got into the car with him and drove north on Western Avenue to 87th Street, and turned right. Defendant told Brines that he did not know or was not aware of what occurred after that until his friends returned to tell him.

At the conclusion of Brines' testimony, the State rested its case and defendant's motion for a directed verdict was denied on the ground that the issue of accountability is a question of fact for the jury.

Next, Dorothy Calhoun, defendant's mother, testified that defendant had been home the entire evening of March 7, 1979, as well as the early morning hours of the following day. Mrs. Calhoun denied that she had mentioned Crump's name to the arresting officers and denied having been told by the officers why they were taking defendant to police headquarters.

In rebuttal, Investigator Lawrence Fenlon of the Chicago police department testified that on March 8, 1979, approximately 5:50 p.m., he and his partner, Investigator Roney, were assigned to arrest defendant at his home. When they arrived at defendant's home, they talked to his mother, who informed them that defendant was not at home. She then asked the officers if they were looking for defendant in connection with the shooting for which Crump had been arrested. She had heard about Crump's arrest on the radio. Later that evening, approximately 10:30 p.m., Fenlon and Roney returned to defendant's home and were invited into the apartment by defendant's father. The parents were told why the officers were there and where defendant was being taken.

Following closing arguments, defendant's motion for a mistrial based upon the State's inflammatory and prejudicial remarks during closing argument was denied. The jury returned with a verdict of guilty of attempted murder, armed robbery and aggravated battery; the court merged the aggravated battery and attempted murder convictions; denied defendant's motions for judgment notwithstanding the verdict, arrest of judgment and new trial; and sentenced defendant to concurrent terms of 15 years. This appeal followed.

Opinion

We first consider defendant's contention that the trial court improperly denied his motions to quash his warrantless arrest and to suppress the subsequently obtained confessions. The State admits that the arrest was made without a warrant, but argues that the existence of probable cause, consensual entry and exigent circumstances justified the warrantless arrest.

■ Neither party disputes the existence of probable cause which was established by the implicating statements made by two of defendant's co-offenders. However, probable cause by itself is not sufficient justification for a warrantless arrest. Either consensual entry given by someone who has control over the premises (*People v. Bean* (1981), 84 Ill. 2d 64, 69-70, 417 N.E.2d 608), or exigent circumstances must also be present. *Payton v. New York* (1980), 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382.

In the present case, defendant's father denied having given his consent to enter to the arresting officers. He claimed that they simply "brushed by" him and went to the upstairs apartment with their guns drawn. In contradiction to Mr. Calhoun's testimony, Investigator Roney, one of the arresting officers, stated that when he and his partner returned to defendant's residence approximately 10:30 p.m. on March 8, after having explained earlier to defendant's mother that they would be returning to talk to defendant, defendant's father answered the door and invited them to come upstairs. When the officers entered the living room, defendant was standing there with his mother.

■ It is well established that a determination as to the credibility of conflicting testimony at an evidentiary hearing is within the province of the trial court, and its ruling will not be set aside absent a finding that it was clearly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 99, 440 N.E.2d 869.) In the present case, the trial court set forth a detailed account of its rationale for denying defendant's motion, specifically stating with respect to consensual entry that:

> "[The officers] went back there at 10:30 and were then given entry by Mr. Calhoun. Now whether they brushed by him or whatever, I think that it is a fair statement that Mr. and Mrs. Calhoun knew exactly why the police were there, there was a time frame in which they could collect their thoughts, that the door was opened and that the Police were ultimately in the home, and that with what I would describe as with little to-do, Kevin went with them under arrest, and that is for sure, too."

It is apparent that the trial court found from a review of the testimony that the totality of the circumstances indicated that there was consensual entry. Upon review of the record, we find no ground upon which to reject this determination and, therefore, concur with the trial court's finding of consensual entry. Accordingly, our conclusion that defendant's warrantless arrest was justified by the existence of probable cause and consensual entry, not only obviates the need to discuss the presence of exigent circumstances (*People v. Bean* (1981), 84 Ill. 2d 64, 69, 417 N.E.2d 608), but also dispels defendant's reli-

ance on *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which prohibits a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest.

Defendant further contends that the trial court committed prejudicial and reversible error when it allowed the State to present evidence of the Oswald incident. Defendant argues that because Oswald's testimony did not provide any evidence that would assist the jury in its determination as to whether defendant had been involved in the Brady incident, its only purpose was "to prejudice the jury against the defendant." In response, the State argues that because the Oswald incident occurred shortly before the Brady incident and the *modus operandi* of each incident was virtually identical to the other, testimony as to the Oswald crime was relevant and properly admissible to show intent, knowledge and common design.

■ As a general rule, the prosecution may not introduce evidence of other criminal acts committed by the accused unless the evidence is substantially relevant for some purpose other than to show the accused's propensity toward criminal acts. (McCormick, Evidence sec. 157, at 327 (1954).) This rule, however, is subject to numerous exceptions, one of which states that evidence of other criminal offenses is admissible to show, by similar acts or incidents, that the offense charged was not inadvertent, accidental, unintentional or committed without guilty knowledge. *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821; McCormick, Evidence sec. 157, at 329 (1954).

■ In the present case, the State does not allege that defendant personally robbed or shot Brady. Instead, it alleges that defendant's participation coupled with the requisite guilty knowledge of what was about to transpire render him criminally accountable for the actions of those who did personally rob and shoot Brady. In order to establish defendant's accountability, the State must prove defendant's intent to promote or facilitate the commission of the substantive crime by either soliciting, aiding, abetting, agreeing or attempting to aid the actual perpetrators. (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).) It was for this purpose that the testimony regarding the Oswald incident was introduced into evidence. Therefore, we concur with the trial court's decision that evidence of the Oswald incident was relevant and properly admissible to show intent, knowledge, common design and *modus operandi*.

Defendant further contends that the trial court's denial of his motion *in limine* to prohibit the prosecution from introducing evidence that Brady was a Chicago alderman prejudiced his rights to a fair and impartial trial.

■ Prior to trial, defendant filed a motion *in limine* to exclude any reference to Brady's status as an alderman on the grounds that this information was irrelevant to the issues at bar and could cause undue prejudice to defendant. In response, the State argued that Brady's employment was "germane" to establishing his credibility and suggested that an equitable solution to defendant's concerns would be for the trial court to inquire during *voir dire* as to whether Brady's employment would have any prejudicial effect on the prospective jurors. The trial court agreed with the State's suggestion and denied defendant's motion. Inasmuch as the record does not include a transcript of the *voir dire*, we must assume that the prospective jurors were adequately queried as to any prejudice with respect to Brady's position as an alderman (see *Schranz v. I. L. Grossman, Inc.* (1980), 90 Ill. App. 3d 507, 511, 412 N.E.2d 1378), and conclude that such an examination is sufficient in itself to create a reasonable assurance that the impaneled jury was both qualified and impartial. *People v. Caldwell* (1976), 39 Ill. App. 3d 1, 4, 349 N.E.2d 462.

Defendant next contends that the trial court committed reversible error when it refused to grant a mistrial based upon the State's overly detailed account of the Oswald incident during its opening statement. Specifically, defendant argues that "[t]he spelling out [of] the details of the Oswald case put the defendant to the task of defending against two separate cases at the same time." We disagree.

■ As previously discussed, evidence of the Oswald incident was properly admissible as establishing motive, scheme, common design, intent, or *modus operandi*. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 186, 449 N.E.2d 821.) Therefore, reference to such evidence during the opening statement is proper and cannot logically be considered prejudicial. (*People v. Wilson* (1980), 87 Ill. App. 3d 693, 697, 409 N.E.2d 344; *People v. Bridges* (1979), 71 Ill. App. 3d 868, 872, 390 N.E.2d 407.) As a caveat, however, it was incumbent upon the State to limit the details of other crimes to those which were relevant to proving accountability. In our opinion, the State did not exceed these limitations in its opening statement. Moreover, any possibility of confusion to the jurors by introduction of details regarding the Oswald incident was clarified by the court's admonishments to the jury during the State's opening statement and, later, by the jury instructions which stated that evidence as to Oswald was being introduced for a limited purpose.

Defendant further contends that he was not proved guilty beyond a reasonable doubt because his uncorroborated post-arrest statements to the police were insufficient to establish the *corpus delicti*.

■ It is axiomatic that in order to establish both the *corpus delicti* and the essential trustworthiness necessary to corroborate a confession, there must be some independent evidence which tends to show that a crime did occur. (*People v. Willingham* (1982), 89 Ill. 2d 352, 358-59, 432 N.E.2d 861.) It is not necessary that the independent evidence prove beyond a reasonable doubt that the crime occurred; it need only tend to prove that an offense occurred and corroborate the facts contained in the confession. If these two requisites are satisfied, the independent evidence together with the confession is sufficient to establish the *corpus delicti. People v. Conley* (1983), 118 Ill. App. 3d 122, 132, 454 N.E.2d 1107.

■ In the present case, the independent evidence elicited from both Oswald and Brady at trial not only tended to show that the offenses occurred, but also corroborated defendant's confessions. Therefore, contrary to defendant's assertions, it was sufficient to establish the *corpus delicti* and to provide proof of defendant's guilt beyond a reasonable doubt.

■ Defendant further claims that reasonable doubt was created by the "uncontradicted" alibi testimony of his mother. We disagree for two reasons. First, the alibi testimony was not uncontradicted. Defendant's three separate confessions provided persuasive contradiction. Moreover, the impact of the alibi testimony, uncontradicted or not, goes to the credibility of the witness, which is a determination reserved for the trier of fact and one for which we will not substitute our judgment. *People v. Conley* (1983), 118 Ill. App. 3d 122, 132, 454 N.E.2d 1107.

■ Finally, defendant contends that his conviction should be reversed as a result of the State's remarks during closing argument which suggested that defendant had a duty to call the co-offenders as witnesses for his defense. The remarks at issue are the following:

> "Regarding the alibi Defense, [Defense] Counsel claims we could have brought in other witnesses. Why didn't he bring in the father?
>
> * * *
>
> Why did he not bring in Armon, Bell or Crump?"

As a general rule, a defendant has no obligation to call witnesses and the fact that he does not raises no presumption that if those witnesses were called, they would have testified unfavorably to him. (*People v. Smith* (1969), 105 Ill. App. 2d 8, 11, 245 N.E.2d 23.) Moreover, it is improper for a prosecutor to comment on defendant's failure to call witnesses where the comment suggests that the witnesses would have testified unfavorably and where the witnesses are as ac-

739

cessible to the State as they are to the defendant. (*People v. Scott* (1980), 92 Ill. App. 3d 106, 112, 415 N.E.2d 1082.) In the present case, while we agree that the State's comments were improper, we conclude that the overwhelming evidence of defendant's guilt nullifies any possibility of prejudice to defendant and precludes a finding of reversible error. *People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.