THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL LONG, Defendant-Appellant.

First District (4th Division)   No. 1—87—1570

Opinion filed December 31, 1990.

Randolph N. Stone, Public Defender, of Chicago (Karen E. Tietz, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Randall

Roberts, and Walter Hehner, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant was convicted of two counts of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)) and sentenced to natural life imprisonment as a habitual offender (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1). On appeal, defendant contends that (1) the trial court erred in denying his motion to quash his warrantless arrest and suppress his subsequent inculpatory statement as the fruit of an illegal arrest, and (2) he was denied effective assistance of counsel at the hearing on his motion to quash, and at his trial. We conclude that the trial court properly denied defendant's motion to quash and that he was adequately represented by counsel. Accordingly, we affirm.

Prior to trial, defendant filed a motion to quash his arrest and suppress his statement to the police. In this motion, defendant argued that the police officers had unlawfully entered his residence without a warrant, and that neither consent nor exigent circumstances justified their warrantless entry into his home to arrest him.

At the hearing on his motion to quash arrest and suppress statements, defendant testified that on the date of his arrest, he lived in the first floor apartment of a two-flat house in Chicago. His girlfriend, Christina White, had been living with him for approximately two months and rented the apartment. Defendant's mother and sister lived in the second-floor apartment.

Defendant further testified that shortly before 9 p.m., he was watching television in the living room at the rear of the apartment. His girlfriend, Christina, had just left the apartment to go to the store on the corner. Defendant's sister, Charmaine, came down the rear stairs to talk to Christina. Defendant told Charmaine that Christina had just gone to the store but would return shortly. He let Charmaine out the back door, locked it, and then returned to the couch to watch television. At that time, he saw a shadow on the wall between the kitchen and the living room. Defendant recalled that it was exactly 9 p.m., because he looked at a clock in the living room. As he started to look around the corner, at least five or six men ran up to him, pointed guns at his face, said "police officers," and then handcuffed him. The officers searched the entire apartment, including cabinets and drawers. When he asked if they had an arrest or search warrant, they said they did not need either one. Defendant testified that

Charmaine, who was on her way back upstairs, immediately returned and began knocking on the back door to be let in. Before he was taken from the apartment by the officers, Christina returned and brought him his coat from the closet. Defendant testified that neither he nor anyone else consented to the police entry into the apartment or gave them permission to search it.

Following defendant's testimony, defense counsel stated that the defense rested on the motion. The State then presented the testimony of two police officers. Officer Peter Ciaccio of the Oak Lawn police department testified that he and and his partner, along with several officers of the Chicago police department, went to defendant's home to arrest him for the armed robbery of a White Hen Pantry store in Oak Lawn that had occurred a few days earlier. Officer Ciaccio stated that he did not attempt to obtain a warrant for defendant's arrest, a process that would have taken six to eight hours. It is undisputed that the officers had probable cause to arrest the defendant, as two individuals had given incriminating statements to police that implicated defendant in the White Hen Pantry robbery.

Officer Ciaccio testified that he and the other officers arrived at defendant's residence at approximately 9 p.m. Officer Ciaccio and three or four Chicago police officers went to the front of the house. Detective Robert Gricus of the Chicago police department knocked on the door. A young woman approximately 20 to 25 years old, who at some point later stated that she lived there with defendant, opened the door. At this time, Officer Ciaccio was standing, with his gun drawn, approximately five to six feet from the door. He was behind Officer Gricus, who did not have his gun drawn, and a uniformed Chicago police officer. Officer Ciaccio did not know if any other officers had their weapons drawn.

When the young woman opened the door, Officer Gricus showed her his police star, identified himself both by name and as a Chicago police officer, and told her that they were looking for Michael Long. She said "come in officers" or "step in officers." When they entered the apartment, they saw defendant seated on a couch, watching television. Officer Gricus asked him if he was Michael Long. When defendant responded in the affirmative, Officer Gricus told him he was under arrest for armed robbery. Defendant was then patted down and handcuffed. Officer Ciaccio testified that he did not prepare a case report following defendant's arrest and did not know whether his partner had done so.

Chicago police officer Gricus testified that at about 9 p.m. on December 23, 1985, he accompanied officers of the Chicago and Oak

Lawn police departments to defendant's residence in order to arrest him for the armed robbery of the White Hen Pantry store. When they arrived at the home, Officer Gricus knocked on the front door, and a young female whose name he could not recall opened the door. Officer Gricus identified himself, showed her his police badge, and asked if defendant was home. She said "step in." He immediately saw defendant and, after identifying himself, asked if he was Michael Long. When defendant responded that he was, Officer Gricus told him that he was under arrest for armed robbery. Officer Gricus did not have his gun drawn and did not notice whether any of the other officers had drawn their weapons. His partner prepared the arrest report, and he did not know if it or any report indicated that they had gained entry into the apartment with the consent of the female who resided there.

Following the testimony of the police officers, defense counsel moved for a continuance for the purpose of locating defendant's girlfriend, Christina. The trial court granted defendant's motion. When the hearing reconvened, the defense called defendant's sister, Charmaine, as a witness. Charmaine testified that on the day of defendant's arrest, she lived with her mother in the second-floor apartment and defendant was living in the first-floor apartment with Christina. Between 8:30 and 9 p.m., Charmaine went downstairs to talk to Christina. Defendant told her that Christina had just gone to the store, and Charmaine left through the back door and returned to the upstairs apartment. She did not see Christina in the upstairs apartment when she returned or while she remained in the apartment.

Approximately 20 minutes later, Charmaine went back down the stairs to the first-floor apartment and began knocking and then pounding on the back door. After approximately five minutes, someone opened the door. Charmaine saw defendant and about six or eight police officers, some of whom had their guns drawn. Charmaine did not see Christina anywhere in the apartment. Charmaine noticed that the apartment was ransacked and that it had not been in that condition when she had left 20 minutes earlier. She asked the detectives whether they had a search warrant, and they responded that they did. Approximately one-half hour later, Christina came down the back stairs with Lois Long, the mother of defendant and Charmaine. Charmaine testified that she surmised Christina had returned from the store after Charmaine had gone back downstairs and found that defendant had been arrested.

Lois Long, the mother of defendant and Charmaine, testified that at approximately 9 p.m., Christina came through the front door of her

apartment and said that the police had defendant, that they were arresting him and that her "house was full of cops." Mrs. Long went downstairs by way of the rear stairway. When she reached the doorway, she saw defendant with six to eight police officers. She did not see the condition of the apartment because she remained outside at the bottom of the stairway.

Following this testimony, the defense rested. After arguments by counsel, the trial court stated that it found credible police testimony to the effect that they entered the apartment with the voluntary consent of the young woman who rented it. On this basis, the court denied defendant's motion to quash the arrest and suppress his statement.

Defendant was prosecuted for the armed robbery of the manager and attendant of a Union 76 Gas Station in Evergreen Park, Illinois, that occurred at approximately 3:45 p.m. on December 19, 1985. Dwayne Edwards, the manager of the gas station, testified that on the date of the incident, he was confronted by two men as Edwards was about to enter the gas station. One man was wearing an army jacket and had a nylon stocking over his face. The second person wore a blue, hooded jacket and had a ski mask over his face. Both individuals were white males approximately 5 feet 7 inches tall and weighing about 130 to 135 pounds. Edwards stated that the man wearing the army jacket and nylon stocking withdrew from his jacket and displayed to him the butt end of a pistol. The man wearing the hooded jacket and ski mask asked Edwards for the keys to the safe in the gas station. When Edwards responded that he did not have the keys, the man wearing the hooded jacket and ski mask took all the money from Edwards' pockets. The two men then fled on foot. Edwards went into the gas station and telephoned the police.

The gas station attendant, Patrick Gumbleton, testified that the two individuals, about whom he gave the same description as that provided by Edwards, had entered the station and taken from Gumbleton all the money in his possession while Gumbleton had been counting the money in the cash register. Thereafter, the men had accosted Edwards and fled. Gumbleton attempted to chase the men for approximately three-quarters of a block, but had been unable to pursue them any farther. Both Edwards and Gumbleton testified that they did not see their assailants get into a vehicle after the robbery.

The State was permitted to introduce into evidence at defendant's trial the circumstances of the armed robbery of a cashier at a White Hen Pantry store in Oak Lawn that occurred a few days later, on December 22, 1985. The cashier, Janet Hayes Carrano, testified that on

that date, at approximately 12:30 a.m., she was confronted by two men who demanded money from the cash registers in the store. One man was approximately 6 feet 4 inches tall, was wearing a brown corduroy jacket, and had a nylon stocking over his head. The second person was approximately 5 feet 7 inches tall, wore an army jacket, and had a ski mask over his face. Both individuals were white males. The man wearing the brown jacket and nylon stocking displayed a gun to Carrano, while the other person took the money from the registers. Both men then fled on foot. Carrano did not see the men get into an automobile after the incident.

The gas station owner and attendant, as well as the cashier of the White Hen Pantry, identified at trial the items of clothing worn by their assailants and the weapon used during the robberies. It was established at trial that these items had been recovered by police from the residence of Eric Petrouskas.

At trial, the court admitted into evidence an oral incriminating statement made by defendant while he was in custody at a police station following his arrest. In this statement, defendant said that he participated in the armed robbery of the gas station and the White Hen Pantry with the assistance of Petrouskas and defendant's brother, Scott Long. According to defendant's statement, Petrouskas drove the car to the gas station, and defendant and his brother went into the station. Defendant admitted that he took money from the gas station attendant's pockets and that he and his brother then fled. In his oral statement, defendant also admitted that he participated in the armed robbery of the cashier at the White Hen Pantry store. Defendant stated he remained in the car, which was parked in an alley near the store, while his brother and Petrouskas, wearing a nylon stocking and ski mask, entered the store and committed the robbery. While at the police station following his arrest, the defendant also signed a written statement incriminating himself in both robberies, and testimony was admitted into evidence to show that defendant had signed such a written account of the incidents. However, the trial court refused to admit the written statement into evidence, because it included references to armed robberies other than those occurring at the gas station and the White Hen Pantry.

In his defense at trial, defendant presented the testimony of his sister, Susan Green, his mother, Lois Long, and a neighbor, Brenda Garcia. Each of these witnesses testified that on the date and time of the robbery of the gas station, defendant was stringing Christmas lights on the outside of the house in which defendant, his girlfriend, and his family lived. All of these witnesses also testified that on the

date and time of the White Hen Pantry robbery, defendant was playing cards with them in the apartment of defendant's mother.

Based upon this evidence, defendant was found guilty and convicted of the armed robbery of the manager and attendant at the Union 76 Gas Station. He was sentenced to natural life imprisonment as a habitual offender. This appeal followed.

Defendant contends that the trial court committed reversible error in denying his motion to quash his arrest and suppress his subsequent statement at the police station because he was illegally arrested in his home without a warrant. Defendant argues that probable cause alone does not justify the warrantless arrest of a suspect in his home without either voluntary consent to enter it or exigent circumstances, citing *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Defendant maintains that neither consent nor exigent circumstances were present in this case and that consequently his statement was inadmissible at trial as the fruit of the illegal arrest.

■ However, defendant's argument with respect to the warrantless entry into his apartment is inconsistent with the United States Supreme Court's decision in *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640. In *Harris*, the police entered the defendant's home without his voluntary consent. The police did not have a warrant, and no exigent circumstances justified their failure to obtain one. Once inside the house, the officers arrested Harris, and he was transported to a police station for questioning. While at the station, Harris waived his *Miranda* rights and signed a written inculpatory statement. This statement was admitted against him at trial, and he was convicted. On appeal to the United States Supreme Court, Harris argued that the police, by entering his home without a warrant, exigent circumstances, or his consent, violated *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. *Payton* held that the fourth amendment prohibits the police from effecting a constitutionally valid warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest, and that under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, a subsequent statement made by the accused is inadmissible as the fruit of the illegal arrest.

The *Harris* court reviewed *Payton* and *Brown* and held that when the police have probable cause to arrest a suspect, the Federal exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest in violation of *Payton*. The majority found *Brown* and its progeny to be distinguishable because in those cases

the police lacked probable cause, whereas in *Harris* the police had justification to question Harris prior to his arrest. The Court reasoned that Harris' incriminating statement made at the police station was not the product of being in unlawful custody or an "exploitation of the illegal entry into Harris' home." *New York v. Harris* (1990), 495 U.S. 14, 19, 109 L. Ed. 2d 13, 21, 110 S. Ct. 1640, 1644.

■ There is no dispute in the instant case that the police had probable cause to arrest defendant when they arrived at his home to arrest him. The record shows that, prior to their arrest of defendant, the officers had been informed that two persons had admitted to the armed robberies and had implicated defendant in the commission of those offenses. Under *Harris*, defendant's voluntary, incriminating statements were lawfully obtained at the police station during interrogation, irrespective of whether the police gained consensual entry into defendant's home in order to arrest him. In light of *Harris*, the admission of defendant's voluntary statement at the police station did not constitute a violation of his fourth amendment rights.

■ Defendant asserts that this court should not follow *Harris* and that the Illinois constitutional protection regarding unreasonable searches and seizures is, or should be, more expansive than that provided under Federal constitutional law. This argument was expressly rejected in *People v. Beasley* (1990), 206 Ill. App. 3d 112, for reasons which we find dispositive in this appeal. As the court noted in *Beasley*, Illinois' constitutional protection regarding unreasonable searches and seizures (Ill. Const. 1970, art. I, §6) closely parallels the fourth amendment to the United States Constitution (U.S. Const., amend. IV). In view of this close parallel, the Illinois Supreme Court in *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147, held that Federal constitutional interpretations regarding the fourth amendment apply to Illinois' constitutional provision regarding unreasonable searches and seizures. Based upon these considerations, the *Beasley* court concluded that *Harris* was applicable to the case before it. In accordance with *Tisler* and *Beasley*, we find that the United States Supreme Court's decision in *Harris* is appropriately considered in our determination of whether the trial court properly denied defendant's motion to quash and suppress.

The cases upon which defendant relies do not conflict with our conclusion in this regard. In *People v. Brocamp* (1923), 307 Ill. 448, 138 N.E. 728, the Illinois Supreme Court held inadmissible evidence obtained in the defendant's home as a result of police officers' unlawful entry into his residence. The case is distinguishable from the instant cause, because defendant here seeks to suppress statements

made at the police station, not evidence seized from his residence. In *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677, the court considered the admissibility of a defendant's statement under Federal, not Illinois, precedent. (See also *People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287; *People v. Wiedman* (1988), 168 Ill. App. 3d 199, 522 N.E.2d 231.) We decline to deviate from the precedent established in *Tisler* and *Beasley* in the instant cause.

In addition, assuming *arguendo* that *Harris* were not applied to the case at bar, the evidence presented in the instant cause supports the trial court's conclusion that the State met its burden of establishing that consent was given to the police officers' warrantless entry into defendant's home in order to arrest him. Defendant argues that the trial court should have credited his testimony that Christina did not consent to the officers' entry because she was at the store when the police entered the apartment. Defendant contends that his testimony in this respect was consistent with that of his sister, Charmaine, and his mother, Lois Long.

The question of whether the police gained entry to a residence through voluntary consent is generally a question of fact to be resolved by the trial court, as finder of fact, at a hearing on a defendant's motion to quash and suppress. The trial court's determination is entitled to substantial deference and will be reversed only if against the manifest weight of the evidence. (*People v. Rose* (1989), 191 Ill. App. 3d 1083, 548 N.E.2d 548; *People v. Turner* (1986), 143 Ill. App. 3d 417, 493 N.E.2d 38; *People v. Calhoun* (1984), 126 Ill. App. 3d 727, 467 N.E.2d 1037.) Based upon our review of the record, we cannot say that the trial court's determination was against the manifest weight of the evidence. The evidence presented was sufficient to justify the trial court's conclusion that the testimony of defendant and his witnesses was less credible than the testimony given by the police officers who testified on behalf of the State.

The testimony of defendant and his witnesses was not free of contradiction. For example, according to defendant, Charmaine returned to the downstairs apartment almost immediately after she had left it upon being told by defendant that Christina had gone to the store. However, Charmaine testified that it was not until 20 minutes later that she went back to defendant's apartment to find out if Christina had returned. Also, although defendant testified that Charmaine returned because she heard a "commotion," Charmaine said nothing about hearing a commotion in defendant's apartment. In addition, the testimony of defendant's mother did not lend any direct support to his assertion that Christina was not at home when the police arrived.

Defendant's mother testified that at approximately 9 p.m., Christina came to her apartment to tell her that the police were arresting defendant and that there were "cops all over [her] house." Defendant states that this testimony shows that when Christina returned from the store, she saw the police stakeout, as well as the circumstance that officers were inside the house, and that Christina decided to "seek aid from defendant's mother in lieu of confronting that number of police alone." It is also possible, however, that after allowing the police into her apartment and witnessing defendant's arrest, Christina felt it her obligation to inform his mother of what was occurring.

In contrast to the divergent or inconclusive testimony given by defendant and his witnesses, the testimony of the police officers was direct and consistent as to the events preceding and surrounding defendant's arrest. Both officers testified that a young female who stated that she lived in the apartment with defendant answered the door and, after being presented with Officer Gricus' identification and being advised that they were looking for defendant, invited them to "step in" or "come in" to the apartment, following which defendant was placed under arrest. In view of this testimony, we find ample evidence in the record to support the trial court's conclusion that the officers' entry was consensual.

■ We also cannot accept defendant's argument that the officers' testimony was rebutted by the alleged fact that there was no mention in any police report that a female granted the police consent to enter defendant's home. The police reports were not admitted into evidence, and the record does not show what was contained in the reports. The police officers who appeared on behalf of the State testified that they could not recall whether an arrest report had been made or what the arrest report might contain. In addition, the officers gave clear and consistent testimony that they were given consent to enter the apartment where defendant was arrested. In light of this evidence, we cannot say that the trial court's factual determination was against the manifest weight of the evidence, on the ground that the officers' reports allegedly failed to mention a female's consent to the officers' entry.

Defendant alternatively contends that the State failed to prove that Christina's consent was voluntary rather than a mere acquiescence to a claim of legal authority. He argues that when Christina opened the door, she was faced with five or six men, one of whom was in a police uniform and at least one other standing two feet from her with his gun drawn. He posits that "[a]ny person, and most definitely the young woman the police say answered the door, would hardly

feel they [sic] had any alternative other than to admit police into their [sic] home."

■ Voluntariness of consent is also a question of fact to be determined from the totality of circumstances based on the testimony of the witnesses (*People v. Rose* (1989), 191 Ill. App. 3d 1083, 548 N.E.2d 548; *People v. Turner* (1986), 143 Ill. App. 3d 417, 493 N.E.2d 38), and the trial court's resolution of conflicts in the testimony will not be disturbed unless it is clearly erroneous. *People v. Calhoun* (1984), 126 Ill. App. 3d 727, 467 N.E.2d 1037.

■ We find no basis in the record to disturb the trial court's determination that Christina voluntarily consented to the police officers' entry into her apartment. Both Officer Ciaccio and Officer Gricus testified that a young female opened the door in response to Officer Gricus' knock and that after he identified himself and stated their purpose for being there, she invited them to "step in." Officer Ciaccio did testify that his gun was drawn. However, he further testified that he was about six feet, not two feet, from the door. In addition, Officer Ciaccio testified that he was standing behind Officer Gricus and a uniformed officer at the time. Accordingly, the evidence of record supports the trial court's ruling.

■ Defendant also maintains that the State was required to call Christina as a witness in order to sustain the State's burden of proof on his motion to quash and suppress. However, the record shows that the consistent testimony of the police officers was sufficient to prove that Christina voluntarily consented to the officers' entry into the apartment. Consequently, we cannot say that the State's failure to call Christina rendered insufficient the State's proof with respect to the defendant's motion to quash and suppress. *People v. Broge* (1987), 159 Ill. App. 3d 127, 511 N.E.2d 1321, is distinguishable, because the officers in *Broge* lacked probable cause to arrest the defendant in his home, and the trial court improperly placed upon the defendant the burden of disproving a police officer's uncorroborated testimony that entry into the defendant's home had been consensual. See *People v. Guerrieri* (1990), 194 Ill. App. 3d 497, 551 N.E.2d 767.

■ In light of our determination that the trial court properly concluded that there was voluntary consent to the officers' warrantless entry into the apartment in order to arrest defendant, we need not consider whether exigent circumstances also justified the warrantless entry into the residence to arrest him.

For these reasons, we conclude that the trial court properly denied defendant's motion to quash and suppress and that defendant's

incriminating statement was properly entered into evidence against him at trial.

Defendant contends that he should receive a new trial because his attorney was ineffective at both the hearing on defendant's motion to quash and at the jury trial. He argues that his attorney was ineffective because he failed to thoroughly prepare his case, waived the presence of a court reporter at jury selection, failed to object to evidence of other crimes, and failed to disclose to defendant that disciplinary proceedings were pending against him.

■■■ In *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, the Illinois Supreme Court adopted the two-prong test enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, on the issue of ineffectiveness of counsel. Under *Strickland*, the defendant must overcome the strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance. The defendant must first establish that defense counsel was actually incompetent in his duties, and then demonstrate that counsel's deficient performance prejudiced the defendant in a manner that denied him a fair trial, and that, absent the alleged errors, the outcome of the trial would likely have been different. (*Strickland*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246; *People v. Perry* (1989), 183 Ill. App. 3d 534, 540 N.E.2d 379; *People v. Bernardo* (1988), 171 Ill. App. 3d 652, 525 N.E.2d 857.) In determining the adequacy of legal assistance, a reviewing court will not focus on isolated instances of alleged deficiencies but, rather, must consider the totality of circumstances. *Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246; *People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089.

We consider first defendant's argument that defense counsel was ill-prepared at the hearing on defendant's motion to quash. Defendant contends that his counsel was ineffective, because he did not discover prior to the hearing that the State would argue and present evidence to show that the police entered the apartment with the consent of defendant's girlfriend, Christina.

■■■ We cannot say that defendant was prejudiced by his counsel's representation at the hearing on defendant's motion to quash. As noted more fully above, defendant's statement was lawfully obtained under the United States Supreme Court's decision in *Harris*. In addition, as defendant suggests in his brief, it is entirely possible that Christina was not called as a witness by defendant's attorney because Christina had moved and could not be located. There is nothing in the

record to indicate that defendant's attorney did not attempt to locate this witness, or that defendant's counsel was not diligent in his attempt to locate her. Under these circumstances, we cannot conclude that defendant was deprived of effective assistance of counsel at the hearing on his motion to quash and suppress.

Defendant also argues that his defense counsel was ineffective when he waived the presence of a court reporter during jury selection. Defendant asserts that this waiver violated Illinois Supreme Court Rule 308 (107 Ill. 2d R. 308), which states that stenographic notes shall be taken during jury selection. He maintains that a transcript was necessary because of an issue regarding jury selection.

The record discloses that on the day after jury selection, but prior to the commencement of trial, the trial court excused a juror for cause. This excusal was based on the juror's misrepresentation during *voir dire* that he had no prior criminal arrests. The record contains a complete transcript of the dialogue among the court, counsel, and the juror, regarding the misrepresentation and the court's resulting excusal of the juror. Trial proceeded with one of the alternatives sitting in the place of the excused juror.

Defendant does not explain what error occurred, or what prejudice resulted, from the absence of stenographic notes of the jury selection proceedings. In addition, the record also shows no prejudice accrued to defendant because of the absence of such stenographic notes. The record reflects that the trial court rejected defense counsel's post-trial argument that defendant was prejudiced by the excusal of the juror for cause. In so ruling, the trial court reviewed the transcript of its proceedings when the juror was excused. The court noted that the alternates had been selected in the same manner as the other jurors, and that neither the State nor the defense had used all its peremptory challenges at the end of jury selection. Given these circumstances, we find defendant's argument with regard to the absence of stenographic notes insufficient ground to grant him a new trial for lack of effective assistance of counsel.

As further illustration of counsel's ineffectiveness, defendant cites his attorney's failure to object to the admission of evidence relating to the armed robbery of a White Hen Pantry three days after the offense for which he was on trial. He argues that the extensive evidence regarding this second robbery did not meet the requirements for admission to show *modus operandi,* or for any other permissible purpose. Defendant contends the evidence was introduced solely to show his propensity to commit crime and that counsel was incompetent in not only failing to object to its introduction, but in conceding its admissibility.

■■ We need not address whether the evidence regarding the robbery of the White Hen Pantry store was properly admitted to show *modus operandi*. Even assuming *arguendo* that this evidence should have been excluded, we cannot say that the failure of defendant's attorney to object to its admission is sufficient to warrant a new trial. Defendant provided an incriminating statement to officers following his arrest in which defendant admitted to his participation in the robbery of the gas station, the offense for which defendant was charged. Defendant's account of the robbery as given in his incriminating statement was corroborated at trial by the testimony of the victims of the gas station robbery. In light of this substantial evidence of the defendant's guilt, we cannot conclude that the outcome of defendant's trial probably would have been different if defendant's attorney had successfully objected to the admission of this other evidence.

Defendant also contends that he did not receive effective assistance of counsel because disciplinary proceedings were pending against his attorney at the time of trial. (See *In re Levin* (1987), 118 Ill. 2d 77, 514 N.E.2d 174.) Relying on *People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136, defendant argues that these disciplinary matters, which counsel failed to disclose to him, affected his performance at trial and resulted in deficient representation.

In *Williams,* defense counsel represented Williams and two other codefendants before one jury, and simultaneously represented a fourth defendant before another jury. All four defendants were charged with capital crimes, and defendant was convicted and sentenced to death. Disciplinary proceedings were in progress at the time of trial and the attorney was subsequently disbarred. (*In re Weston* (1982), 92 Ill. 2d 431, 442 N.E.2d 236.) The *Williams* court took into account the additional burdens placed on both the court and counsel because of the simultaneous trials for four defendants, and the admissions of defendant's attorney at the disciplinary hearing that he had been under such emotional stress that he "did not feel mentally or physically capable of presenting his case before the [disciplinary commission]." (*Weston,* 92 Ill. 2d at 436.) The supreme court held that although it could not characterize the trial performance of defendant's counsel as actual incompetency, "considering the unique circumstances and sequence of events in this capital case, *which will rarely, if ever, be duplicated,* that the interests of justice require that [defendant] be granted a new trial." (Emphasis added.) *Williams,* 93 Ill. 2d at 325.

Defendant in the case at bar argues that "this is the rare case that duplicates the unique circumstances in [Williams]." Nearly identi-

cal assertions were made and rejected in *People v. Bernardo* (1988), 171 Ill. App. 3d 652, 525 N.E.2d 857, and *People v. Perry* (1989), 183 Ill. App. 3d 534, 540 N.E.2d 379. In *Bernardo*, the defendant contended that his attorney was ineffective because he was suffering from a mental illness, drug addiction, and the mental strain of pending disbarment proceedings. We held that the case was factually distinguishable from *Williams*. Unlike Williams, Bernardo was not charged with a capital offense, nor was the evidence either voluminous or complicated. We therefore held that the *Bernardo* case did not present the unique circumstances which existed in *Williams* and applied the *Strickland* test, under which defendant failed to establish that he was denied effective assistance of counsel.

A similar result was reached in *Perry*, involving the same defense attorney who was retained by defendant in the case before us. With one notable exception, *i.e.*, that defendant in *Perry* was advised of his counsel's disciplinary proceedings before commencement of defendant's trial and elected not to seek substitute counsel, the allegations made by Perry regarding counsel's alleged ineffective performance at trial are similar to those raised by defendant in this case. Perry argued that the mere pendency of disciplinary proceedings renders an attorney incompetent to defend in a criminal case. The court disagreed, stating that the fact that the supreme court permits lawyers to continue to practice until they are suspended or disbarred negated Perry's theory. The court also determined that the case before it did not involve the unique circumstances present in *Williams* and, as in *Bernardo*, examined Perry's specific examples of alleged ineffectiveness under the standard in *Strickland*. Applying that test, the court concluded that defense counsel provided Perry with effective assistance of counsel.

Similar to the courts in *Bernardo* and *Perry*, we find no unique circumstances such as those in *Williams* to warrant a departure from the *Strickland* test requiring proof of actual incompetence without which the outcome of the trial would likely have been different. Reviewing the entire record of counsel's representation of defendant in the case at bar, we cannot say that the attorney rendered defendant ineffective assistance. That his efforts on defendant's behalf were not successful does not constitute incompetency entitling defendant to a new trial. *People v. McNutt* (1986), 146 Ill. App. 3d 357, 496 N.E.2d 1089.

Aside from the other specific allegations of ineffectiveness which we have reviewed and rejected, the only remaining instance cited in support of defendant's contention is a remark by the trial

court when defense counsel appeared 10 minutes late from a recess. After counsel explained that he had been delayed at a sentencing hearing in another case, the court replied, "[y]ou've got too many cases." There is nothing in the record to disclose the extent of defense counsel's caseload. We do not believe that an isolated remark by the trial court regarding the defense attorney's heavy caseload establishes that counsel was unable to provide effective assistance to defendant in the case at bar. We also note that the trial court's remark was made outside the presence of the jury and did not serve to prejudice defendant at trial.

For the reasons stated, defendant's conviction and sentence are affirmed.

Affirmed.

LINN and JOHNSON, JJ., concur.