2022 IL App (2d) 200624-U
No. 2-20-0624
Order filed September 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2124 |
| FRANK G. FARELLA, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*: The evidence presented was sufficient to find defendant guilty of first-degree murder and trial counsel was not ineffective for (1) employing trial strategy in not calling a particular witness and (2) eliciting the fact that defendant was on parole at the time of the offense.

¶ 2     Defendant, Frank G. Farella, appeals from his conviction in the Circuit Court of Lake County on one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2018)). He was sentenced to 60 years in the Illinois Department of Corrections. Defendant contends that the evidence presented at trial was insufficient to sustain his conviction. Further, defendant contends that he received ineffective assistance of counsel when his attorney (1) failed to subpoena a witness that

defendant asserts would have corroborated his version of events; and (2) elicited testimony that defendant was on parole at the time of the murder. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with three counts of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) related to the September 5, 2018, shooting death of Shane Colella. The indictment alleged that defendant knowingly fired two shots at close range creating a strong probability of death or great bodily harm.

¶ 5     At defendant's jury trial, Christopher Schubert testified that he had known Colella since high school and occasionally purchased cannabis from him. Schubert purchased cannabis from Colella on September 4, 2018. On the morning of September 5, 2018, Schubert texted Colella to arrange a time to go to Colella's house and pay him the money he owed for that cannabis. Schubert sent a few texts in the morning, around 9 a.m. and 10 a.m., which went unanswered. On his lunch break, Schubert drove to Colella's house. When there was no answer at the door, Schubert entered the house from the rear door, which led into the kitchen. There, he discovered Colella's body, which was not moving and had blood coming from it. Schubert exited the house and drove directly to the police station which was nearby. Schubert was advised by the first person he approached in the parking lot to call 9-1-1. Because Schubert did not know Colella's address, he drove back to the house and called 9-1-1 where he could see the address.

¶ 6     Officer Theodore Potkonjak, an evidence technician with the Zion Police Department responded to Colella's residence. There, he took pictures of blood swipes on the door, as well as pictures a bag of cocaine found under a bed and a bag of cannabis found in the kitchen. Potkonjak testified that the house did not appear to have been ransacked.

¶ 7     Michael Reid, the Deputy Coroner Investigator of the Lake County Coroner's Office, testified that he responded to a call at approximately 2:18 p.m. on September 5, 2018, to Colella's address. He made a written case report that noted the victim's body was cool to the touch and seemed to be in the early stages of rigor mortis.

¶ 8     Dr. Mark Witeck, a forensic pathologist of the Lake County Coroner's Office, performed an autopsy on Colella on September 6, 2018. He testified that he conducted an external examination of Colella's body and noted a shotgun-wound in the left thigh, and one near the left ear on the head. Witeck testified that the thigh wound would not have caused immediate death but would have resulted in Colella eventually bleeding to death, whereas the wound to the head would have caused almost instantaneous death. He opined that, if the signs of early rigor mortis were observed around 1:00 p.m., then Colella likely died "the morning of that day, probably a couple hours earlier."

¶ 9     Nancy Dugan, defendant's family friend, arranged for defendant to live in a house located on Jethro Avenue in Zion. The house was under renovation and the owner wanted someone to live there because he was concerned about people breaking in. Dugan testified that she knew defendant to be working multiple jobs including delivering pizzas and doing roofing work. Dugan testified that she purchased a white Honda Civic for defendant. Dugan retrieved defendant's belongings from the basement in Zion after he was arrested and stored them in her garage. The items were mostly in garbage bags and plastic bins. Dugan testified that the reason defendant did not have a lot of belongings was because he had recently been released from prison and was on supervised release.

¶ 10     Tracy Wates, Colella's cousin, drove by Colella's house on the morning of September 5, 2018, around 10 a.m. and noticed a gold truck in the driveway. On her return trip, around 10:40

a.m., the truck was gone. Wates testified that she did not see anyone in the truck, and she did not see anyone outside Colella's home as she drove by.

¶ 11    Officer Kevin Balinovic, of the North Chicago Police Department, testified that he recognized a gold Chevy Silverado pickup truck from a "critical reach" alert while driving. He approached defendant who was doing gutter repair work in Waukegan on Martin Luther King Boulevard on September 7, 2018, and questioned him. Defendant provided his identification; he was not confrontational and did not try to flee. Balinovic did not arrest defendant.

¶ 12    Detective Shaun Knight, of the Lake Zurich Police Department, testified that after Colella was found dead, he canvassed the neighborhood surrounding Colella's home and recovered surveillance video from the morning of the murder from multiple sources including a nearby gas station.

¶ 13    Detective James Smith, of the Waukegan Police Department, pulled defendant over on September 8, 2018, while he was driving a white Honda Civic because the plates did not match the make and model of the vehicle. Smith observed a knotted plastic bag, consistent with drugs, in the car. Smith asked defendant to step out of the car; however, after indicating that he would comply, defendant instead drove away.

¶ 14    Megan Griffel, defendant's girlfriend, testified that she had plans with defendant on the morning of September 5, 2018. Defendant did not arrive to her house until later in the afternoon in the gold Chevy Silverado. At that time, the two of them went to a gas station and then went to defendant's house on Jethro Avenue in Zion. Griffel testified that she was using crack cocaine at the time, ranging from using $500-$1000 per day, and that she used crack cocaine after the two of them returned from Meijer. Defendant then left the house, but Griffel remained there until the morning of September 7 and got a ride back to her home from a family member.

¶ 15     On the evening of September 8, defendant arrived at Griffel's house and the couple spent about 45 minutes there before they left in defendant's white Honda Civic. At that time, they drove to a gas station where defendant gave Griffel $20 and told her to go inside and get change. When she returned, she noticed a shotgun on the front seat. Defendant told Griffel that he had a bad day because he had been stopped by the police and drove away. He also told Griffel that he had lost his phone.

¶ 16     After leaving the gas station, defendant drove to an apartment building. He went into the building with the shotgun. Shortly thereafter, defendant returned to the car with the shotgun. The couple then drove to a wooded area and defendant asked Griffel to dispose of the shotgun in the woods. The shotgun was wrapped in a t-shirt. Griffel did as she was asked and put the shotgun in the woods. The two then drove back to defendant's house on Jethro Avenue in the early hours of September 9 and used drugs.

¶ 17     David Walker, defendant's boss, then picked up defendant and Griffel from the house on Jethro Avenue and they all drove around for a few hours. Sometime before the afternoon of September 10, Griffel and defendant picked up a different car, a blue Ford Taurus, and drove around for hours smoking crack cocaine. On the evening of September 10, defendant and Griffel stopped in Waukegan to try and jump start the gold Chevy Silverado when police arrived. Griffel went to the Zion Police department and spoke to detectives with the Major Crimes Task Force. Griffel testified that, at first, she lied to the police because she was scared, but eventually she cooperated and gave the police details on how to find the shotgun. Griffel testified that she did not see any blood in the gold Chevy Silverado on September 5 when defendant picked her up, nor did she see any blood at his house on Jethro Avenue.

¶ 18    Officer Kirk Helgesen, of the Gurnee police department, is an evidence technician who collected and packaged a discharged Remington 20-gauge shotgun shell casing that was found in the gold Chevy Silverado.

¶ 19    Sergeant Paul Kehrli, of the Zion police department, went through defendant's belongings, which Nancy Dugan had retrieved from the Jethro Avenue house. Among the belongings, Kehrli located two 20- gauge shotgun shells inside a clothing rack.

¶ 20    Detective Joseph Richardt, of the Zion police department, arrived at Colella's house on September 5, 2018. He testified that he searched the home for evidence and took photographs of items in the home. On September 11, Richardt documented two 20-gauge shotgun shells that were found inside the pipes of a clothing rack, and another 20-gauge Remington shotgun shell that was found inside a tote bag. Both the rack and the bag belonged to defendant, as Dugan had retrieved them from the Jethro Avenue residence. Richardt also assisted in locating the 20-gauge shotgun in the wooded area as described by Griffel.

¶ 21    Carol Gudbrandsen of the Lake County state's attorney office was called to testify. She is a cybercrimes and forensic analyst. Gudbrandsen was trained to use software that can extract data from cell phones. When Gudbrandsen used this technology on defendant's phone, she was able to ascertain that defendant and Colella exchanged text messages for a few days in July 2018, but no messages were sent or received between defendant and Colella in August or September 2018.

¶ 22    Sergeant Jason Kapusinski of the Libertyville police department testified that he analyzed the cell phone that was found in the gold Chevy Silverado when defendant was arrested. Kapusinski looked at the phone's Google Maps data timeline, which showed the phone had been in certain areas of Zion relevant to the case, namely the Meijer gas station and an elementary school near Colella's home that provided surveillance footage of the gold Chevy Silverado. Kapusinski

testified that David Walker volunteered his cell phone to police for extraction, but he did not search Walker's home for any additional phones. Walker failed to produce any invoices for work performed on September 5. Kapusinski testified that he followed up on all leads regarding Walker.

¶ 23    Gary Lind, a firearm examination expert, testified that the spent shell casing recovered in the investigation by Kirk Helgesen was fired from the shotgun recovered in the wooded area. He testified that he could not conclusively say that the pellets that hit the victim came from that same shotgun, but that they had the consistent class characteristics of pellets that would be used in that weapon. Lind testified that this was the first time in his career of more than 13 years that he had come across quarter-inch pellets, or #3 buck-size pellets, as recovered in the investigation of the home, and the bullets recovered with defendant's property.

¶ 24    Defendant testified that he had been released from prison on March 13, 2018, following a conviction for conspiracy to distribute cocaine, and was on supervised release. At time of the murder, defendant had worked delivering pizzas and in various capacities for CR Roofing. His boss at CR Roofing was David Walker, who he had known for about 25 years. Through the roofing job, defendant often drove a gold Chevy Silverado pickup truck. Defendant testified that at approximately 9:00 a.m. on the morning of September 5, Walker called him on a cell phone provided by CR Roofing and asked him to get "an eightball" of cocaine from Shane Colella. Defendant was aware that Walker was a cocaine user at that time. Defendant testified to using cocaine two to three times a month.

¶ 25    Defendant had known Colella for about 15 years. He knew Collela to be a cocaine dealer and had personally purchased cocaine from him in the past. Defendant testified that he agreed to try and get the cocaine from Colella for Walker because he knew Walker did not have any money, and that he was already in debt to Colella from a previous purchase.

¶ 26    Defendant testified that he drove over to Colella's house without calling because he was familiar with the location, and he no longer had Colella's phone number. Defendant drove the gold Chevy Silverado because he was supposed to go to work that morning. He arrived around 9:30 a.m. and after he parked, he went around to the back of the house. No one answered when he knocked on the door, so eventually he went around to the front door and knocked. No one answered the front door, so defendant went back to the truck and attempted to look Colella up on Facebook but could not find his number or send a message. Defendant went back to the door and knocked again but there was still no answer.

¶ 27    After spending about 15 to 20 minutes at Colella's house, defendant decided to leave but the truck would not start. He testified that the truck had a faulty antitheft device that required the car to be shut down for 10 to 15 minutes before it would restart. Defendant was familiar with this problem as it had happened to him roughly 10 times previously. Once the truck started, he left the house and was on his way to work when he called Walker on the CR Roofing phone. Defendant told Walker that Colella did not answer the door. Walker told him he was going over there himself. Defendant then stopped at a Citgo station for gas and cigarettes. Surveillance video of this stop was acquired during the investigation and admitted into evidence. Defendant confirmed that he was on the video wearing a White Sox jersey and that at one point while he was filling up, he looked at the bottoms of his shoes because he had just "stepped in some sticky stuff" in a puddle near the gas pump.

¶ 28    Defendant testified that he was given a shotgun on September 7, 2018. On that night Walker asked defendant to meet him at Casey's bar in Waukegan. Defendant drove to the bar in his white Honda Civic while Walker drove the gold Chevy Silverado. Walker was at the bar with his brothers George and Tony, as well as a man named James Webb who was looking for extra

workers for his paving business, a potential employment opportunity for defendant. After about 20 minutes in the bar, Walker suggested defendant and Webb go outside with him for a cigarette. Defendant testified that while they were outside, Walker went to the truck and came back with a pool cue bag and a paper bag containing shotgun shells. Walker told defendant to get rid of the items. When defendant looked in the pool cue bag, he discovered it contained a shotgun. Defendant agreed to take the items and put them in his white Honda Civic. He then left Casey's and went home. He testified to putting the gun up in the rafters of the garage and the shells in the basement. He placed some of the shells inside a clothing rack in case his parole officer came to the house.

¶ 29    Defendant testified that after the incident with the police on September 8 when he fled during a traffic stop, he was concerned the police would come to his house. He decided to remove the gun and stay at a friend's house. He picked up Megan Griffel and stopped at the apartment of an acquaintance known as "D," where he intended to sell the shotgun. When that plan did not work, he drove to a wooded area near Gurnee and asked Griffel to dispose of the shotgun. After that, he and Griffel returned to his house for about 45 minutes. Then Walker called defendant and arranged to switch his white Honda Civic with a blue Ford Taurus. When Walker arrived, he, defendant, and Griffel went out driving around again for some time. Defendant testified that he never saw Shane Colella on September 5 and did not shoot him.

¶ 30    The jury found defendant guilty of one count of first-degree murder. After a sentencing hearing, at which the trial court noted defendant's significant criminal history, the court sentenced him to the maximum term of 60 years in the Illinois Department of Corrections. Defendant timely appealed.

¶ 31                          II. ANALYSIS

¶ 32    Defendant raises two issues on appeal: (1) the circumstantial evidence presented against him was insufficient because it failed to prove that he entered the victim's home and because there was no forensic evidence that connected defendant to the crime; and (2) defense counsel was ineffective for failing to produce James Webb as a witness to corroborate the timing of when defendant received the shotgun, and for eliciting the prejudicial testimony that he was on supervised release from prison at the time of the murder. We hold that the evidence was not insufficient for the jury to find defendant guilty, and that counsel was not ineffective.

¶ 33    We will begin with the first issue. "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. This standard of review recognizes the responsibility of the trier of fact to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence. *Id*. A reversal is warranted only if the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt as to the defendant's guilt. *People v. Ehlert,* 211 Ill. 2d 192, 202 (2004). For the following reasons, we determine that the evidence was not insufficient.

¶ 34    Here, defendant argues that there was only circumstantial evidence that he entered Colella's home, that he possessed a shotgun on September 5, or that he had any motive to commit murder. Further, he argues that police failed to fully investigate David Walker as a suspect, and that the evidence concerning Colella's time of death shows the murder occurred at approximately 11:18 a.m., after defendant testified that he had left the property.

¶ 35    When a criminal defendant challenges the sufficiency of the evidence that resulted in a conviction, our function is not to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

Rather, "after viewing the evidence in the light most favorable to the prosecution," we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Id.* Except in cases where testimony is "so lacking in credibility that a reasonable doubt of defendant's guilt remains" (*People v. Schott*, 145 Ill. 2d 188, 207 (1991)), we afford great deference to the jury's assessments of witness credibility, as it is "in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony" (*People v. Richardson*, 234 Ill. 2d 233, 251 (2009)). Likewise, "[w]here evidence is presented and such evidence is capable of producing conflicting inferences, it is best left to the trier of fact for proper resolution." *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). The trier of fact is "not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.*

¶ 36    "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *Id.* at 417. It is well-established that a conviction may be based solely on circumstantial evidence, and the trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence. *Id.* Instead, "[i]t is sufficient if all the evidence taken as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Id.* (quoting *People v. Edwards*, 218 Ill. App. 3d 184, 196 (1991)).

¶ 37    Defendant first argues there was no specific evidence that he ever entered Colella's home. However, proving whether defendant actually entered the home was not required; rather the State need only have presented evidence for a juror to make a reasonable inference that he could have entered the home. Here, Christopher Schubert testified that he walked in through the back door

without a key just a few hours after defendant was there, indicating that the house was not secured. In addition, the jury heard that defendant was on the property around the time when Colella was found dead from shotgun wounds. The jury also heard testimony from Gary Lind, a firearm examination expert, that the spent shotgun shell found in the gold Chevy Silverado that defendant had driven to Colella's house had the individual characteristics of a shell that was "microscopically identified" as having been fired from the shotgun that was hidden in the woods by defendant and Griffel. The mere fact that defendant attempted to hide the shotgun was highly probative, as "[e]vidence that a defendant has attempted to conceal or suppress evidence is admissible as tending to show consciousness of guilt." People v. Turner, 78 Ill. App. 3d 82, 94 (1979). Additionally, the three unfired shotgun shells found in defendants belongings were all 20-gauge, the same as the spent shells recovered from the gold truck.

¶ 38    Defendant also points out that Colella's blood was not found on his clothing, his shoes, or in the gold Chevy Silverado. However, we agree with the State that forensic evidence was not required. A reasonable juror could infer that defendant committed this crime without necessarily getting blood spatter on his clothing or his shoes, or that he destroyed his clothing and his shoes before they were examined by the authorities. Likewise, it would not be unreasonable to infer that defendant entered and exited Colella's home without leaving behind fingerprints or other forensic evidence. As noted, the jury was not required to "search out all possible explanations consistent with [defendant's] innocence and raise them to a level of reasonable doubt." *People v. Campbell*, 146 Ill. 2d 363, 380 (1992).

¶ 39    For similar reasons, we reject defendant's remaining arguments regarding the evidence. As to whether the police "fully" investigated David Walker's possible involvement in the crime, Sergeant Kapusinski testified that the authorities followed up on all leads involving Walker. To

suppose otherwise is mere speculation. As to defendant's suggestion that the State offered insufficient evidence to establish his motive to murder Colella, the State correctly points out that motive is not an element of the crime that it was obligated to prove. See *People v. Gonzalez*, 388 Ill. App. 3d 566, 586 (2008).

¶ 40   Additionally, defendant's assertion that Colella's time of death did not align with when defendant's vehicle was observed at Colella's house is also unavailing. The assertion that Colella's time of death was between 11:00 a.m. or 12:00 p.m. hours is based on Dr. Witeck's testimony that if there were signs of early rigor mortis at 1:06 p.m., then he believed that the time of death would have been "probably a couple of hours earlier." We note that Witeck's testimony is based on the report of Michael Reid, the Deputy Coroner, who noted the body showing early signs of rigor mortis based on the time that Reid arrived at the scene.

¶ 41   But even giving the utmost credence to Dr. Witeck's opinion, as the State argued at trial, the timeline of Colella's murder could not be established down to the minute. Indeed, it did not have to be as Colella's plausible time of death was a question of fact for the jury to determine. Similarly, the jury was not required to credit defendant's testimony about precisely when he was at Colella's house that morning. As has often been said, defendant was under no obligation to testify, but when "a defendant elects to justify or explain his presence at or near the scene of a crime, while denying participation, he must tell a reasonable story or be judged by its improbabilities." (Citations and internal quotation marks omitted.) *People v. Spagnolia*, 21 Ill. 2d 455, 458 (1961). Here, it is manifest in the verdict that the jury rejected defendant's explanation, and, once again, we remind defendant that the jury was not required to "search out all possible explanations consistent with [his] innocence and raise them to a level of reasonable doubt." *Campbell*, 146 Ill. 2d at 380. In sum, defendant's challenge to the sufficiency of the evidence is

unpersuasive and we decline defendant's invitation to reweigh the evidence or to disturb the jury's verdict.

¶ 42     As to the defendant's second contention, that he was provided with ineffective assistance of counsel, we use the *Strickland* test to determine whether counsel's performance was both (1) deficient and (2) prejudiced defendant such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88.

¶ 43     Defendant first argues that counsel was ineffective for failing to subpoena James Webb to testify. The record reflects that counsel was considering whether to call Webb at the close of evidence on December 11, 2020, but had not decided for certain. Counsel understood from prior conversation with Webb that he would appear voluntarily so counsel never issued a subpoena requiring his presence. Counsel advised the court that he expected Webb to testify to seeing David Walker give defendant a pool cue bag outside of a bar on September 7, two days after the murder. Even if Webb testified to seeing the exchange of the bag, defendant does not assert that Webb was aware of the contents of the bag or heard what Walker said.

¶ 44     It is well settled that counsel's decision as to whether to present a particular witness is within the realm of strategic choices that are generally not subject to attack on the grounds of ineffectiveness of counsel. *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999). We acknowledge that counsel's opening statement specifically mentioned Webb's testimony; however, trial strategy may evolve in due course, and we note that the record reflects that the defense analyzed whether to call Webb based on defendant's testimony. As this was not in the presence of the jury, best

practices would have been for counsel to inform the jury that Webb would not testify, counsel did not do so. Counsel's choice not to call a witness may be deemed ineffective if counsel fails to present exculpatory evidence or support an otherwise uncorroborated defense. *Id.* However, that is not the case here because all that Webb's testimony could corroborate was that defendant received a billiards bag, not that defendant had been given a shotgun. This testimony does not rise to the level of being exculpatory. Accordingly, the decision not to call this witness does not rise to the level of deficient performance. *Cf.*, *e.g.*, *People v. O'Banner*, 215 Ill. App. 3d 778, 790 (1991) (where counsel failed to call a witness who would establish that defendant had not shot the victim, when witness previously told counsel that *he* had actually shot the victim). Since this claim fails to meet the first prong under *Strickland*, it necessarily fails.

¶ 45   Defendant's second argument regarding counsel's ineffectiveness is that counsel should not have elicited testimony on cross-examination from Nancy Dugan that defendant was on supervised release at the time of the offense. Defendant then asserts that counsel "compounded" this error when he elicited defendant's testimony that he had been convicted of conspiracy to possess with intent to distribute cocaine in 2013. According to defendant, counsel should not have elicited that testimony from Dugan earlier as it was not certain at the time that defendant would eventually take the stand. We are not convinced.

¶ 46   We note that prior to trial, in response to the State's motion in *limine*, counsel indicated that defendant's parole status could help explain why he drove off from the traffic stop. Counsel also stated that he wanted to show that defendant was not a destitute or desperate 54-year-old man but, rather, had recently been released from prison and was working multiple jobs to provide for himself and get back on his feet. That was not an unreasonable strategy. *Cf. People v. Palmer*, 162 Ill. 2d 465, 476 (1994) (noting that "counsel's strategic choices are virtually unchallengeable").

But even assuming counsel's performance was deficient for eliciting that testimony from Dugan—and we do *not* find that it was—defendant cannot show prejudice. We need not ponder defendant's hypotheticals about the possible damage to his case from Dugan's testimony alone had he not testified. The simple fact is that defendant did testify, and evidence of his prior conviction was admissible whether it came from him or from Dugan. See People v. Montgomery, 47 Ill. 2d 510, 519 (1971). Moreover, defendant's status as a felon was a minor issue compared to the circumstantial evidence showing that he murdered Colella with a 20-gauge shotgun on the morning in question. Put differently, defendant cannot show that, but for Dugan stating that he was a felon, the outcome of the proceeding probably would have been different. *Strickland,* 466 U.S. at 694.

¶ 47                               III. CONCLUSION

¶ 48     We determine that the State's evidence was sufficient and that defendant's counsel was not ineffective on the grounds defendant has argued. Thus, for the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 49     Affirmed.